**Yul Tracy LEE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–95–00279–CR.**

Court of Appeals of Texas, Houston (1st Dist.).

April 10, 1997.

Discretionary Review Refused Sept. 10, 1997.

**4**

Tony Aninao, Houston, for appellant.

Sandra J. Pomerantz, Houston, for appellee.

**OPINION**

HEDGES, Justice.

A jury found appellant, Yul Tracy Lee, guilty of capital murder, specifically of intentionally causing the death of Jerome Listvan while in the course of committing and attempting to commit robbery. The court assessed punishment at life imprisonment because the State did not seek the death penalty. We affirm the judgment of the trial court.

In six points of error, appellant contends that the evidence was insufficient to show his intent either to cause the death of the deceased or to commit robbery; that the trial court failed to make required written findings of facts and conclusions of law concerning the voluntariness of his confession; that the trial court erred in refusing to grant his motion to suppress; and that a portion of the prosecution's jury argument was improper.

**The Facts**

Jerome Listvan was killed on September 29, 1993. He was 69 years old and had lived in Houston since 1945. He had operated an auto sales and repair business at a location on Fulton since 1966. Although Listvan had retired about 1990, he continued to do auto repairs for friends. He lived at his former business establishment on Fulton.

Irene Medina lived next door to Listvan. She testified that at 10 minutes before 4:00 p.m. on September 29, she spoke to Listvan through her window and asked him to come light the pilot light on her water heater. He promised to come in a few minutes.

Medina worked on her laundry for a while. Then, as she was watching through her window for Listvan to come, she saw a man walk from the front of Listvan's establishment toward the front of her house. The man came up to a car, looked in, and opened the car door. Medina shouted at him. The man turned and looked at her, then got in the car and left at a normal rate of speed.

Medina testified that she ran to Listvan's place and banged on the door. When she got no answer, she went back to her house and called him; she got only his answering ma-

chine. Shortly thereafter, a friend of Listvan's arrived. Upon looking in the windows of the establishment, he ran to Medina's house and asked her to call the police. After calling 911, Medina went into the establishment and saw Listvan lying in the living room, on his back, with blood everywhere. She testified that about 30 or 35 minutes had elapsed since she had spoken to him through her window.

Appellant testified that he was 38 years old. On September 29, 1993, he had been unemployed for about a month. He was living "in and out of places." Sometimes he stayed with his brother, sometimes with friends.[1] For a few days before September 29, he was staying down the block from Listvan in a vacant house without utilities, lights, or water. He had about $15 or $20 in his pocket before his encounter with Listvan.

Appellant stated that he and Listvan considered themselves good friends and that he had been in Listvan's establishment many times. As he was walking by Listvan's establishment on the afternoon of September 29, he saw a car in front that he had never seen before, and he noticed that the keys were in it.[2] He approached the front of Listvan's establishment, saw that the door was ajar, knocked on the wall, opened the door, and saw Listvan sitting at a table doing some paperwork. He called to Listvan and asked if he could come in to use the bathroom and have a drink of water. Listvan acquiesced.

Appellant testified that after he used the bathroom, Listvan filled a coffee cup with water for him. They then engaged in conversation. In the course of their conversation, Listvan inquired about appellant's parents. Appellant became frustrated when he learned that Listvan had not visited his parents in a year or two. He scolded Listvan and gestured with his forefinger. At that point, Listvan pushed appellant's hand away

and called him a "son-of-a-bitch." He pushed appellant so that appellant fell backwards and landed on his back on the edge of the couch. Appellant said that Listvan, normally a mild man with whom he had never quarreled, then started hitting him.[3] Angered, appellant started hitting Listvan with the coffee cup in his hand.

Appellant stopped hitting Listvan when the latter stopped hitting him and finally fell. When appellant laid him on the "deal," he could hear Listvan's breathing very distinctly. He admitted he did not call 911 for help.

In the bathroom, appellant saw blood all over himself. He tried unsuccessfully to rinse the blood off. He then remembered that Listvan owned a truck. He decided to leave in the truck. He was unable to find the truck's keys in Listvan's pockets. He pulled out Listvan's wallet, thinking the keys might be under the wallet. He was concerned that Listvan would wake up during the search for the keys. He was emphatic that Listvan was breathing and moving during this time. Then appellant remembered the car outside with the keys in it. He walked out the door with the mug and wallet still in his hand. He heard someone say "hey," looked around, got into the car, and drove away.

Appellant testified that all he could think of was how to get away quickly from the scene. However, Officer Padilla, a latent print examiner with the Houston Police Department, testified that the bathroom floor and sink had been wiped clean. He said that with the use of chemicals he observed fingerprints and blood smears at the crime scene. There were not enough characteristics in the fingerprints, however, to make an identification.

Appellant drove the car to Hunt's Motel and left it in the parking lot. He also spent some, if not all, of the money he had found in Listvan's wallet (about $100) on crack. He

---

1. According to his statement to the police, appellant was kicked out of the house he was living in, his car was stolen, his brother had kicked him out, and he had been turned down for several jobs.

2. The car, a Ford LTD, had been purchased by Listvan a few days before.

3. However, two of the police officers present when appellant was arrested the next day, September 30, testified that he appeared to have no injuries or bruises.

testified that he walked to the vacant house where he had been staying and left Listvan's wallet there; walked to his brother's house to shower and change clothes; got high on crack (for a long time); stopped twice at the Corner Bar and left Listvan's car there. The time frame of those events is unclear in both appellant's trial testimony and in his statement to the police. Appellant testified that he was in the habit of using crack. He stated that he had been under the influence of alcohol or drugs on the morning of September 29 but not in the afternoon. Eventually, he returned to the vacant house to retrieve Listvan's wallet. Then he walked back to the car at the Corner Bar. His arrest occurred much as the police officers testified.

Sergeant Burmester testified that he and Officer Fincher received information about 7:30 p.m. on September 30 that Listvan's missing car (the one taken by appellant) had been located at the Corner Bar. Burmester and Fincher went to the Corner Bar where they were joined by Officer Kay, the officer who had done the crime scene investigation at the Fulton location the previous day. Officer Kay began examining the car for evidence. Burmester noticed a man, later identified as appellant, walking towards the car. Fincher stopped appellant, who appeared to fit the description given by Medina, and asked him for his I.D. Fincher also asked him to raise his shoe because Fincher remembered the shoe pattern that he had seen the day before at Listvan's establishment. The pattern was the same. Burmester had noticed footprints next to the car and asked appellant to place his foot beside them in the soft sand. The footprints matched. Burmester and Fincher also noticed there were blood spots on appellant's shoes. Appellant attempted to pull away from the police, but Fincher restrained and handcuffed him. During a search of appellant, the officers found a set of car keys, two wallets, and a crack pipe. The police took appellant downtown where he made a statement.

### Waiver

We first address the State's contention that under *DeGarmo v. State*, 691 S.W.2d 657, 661 (Tex.Crim.App.1985), appellant has waived any error when he admitted committing the crime. To establish that appellant admitted killing and robbing Listvan, the State relies on the statement appellant gave to the police, which was admitted into evidence, and on appellant's testimony at the guilt/innocence phase of the trial. We disagree with the State's contention.

It is clear from his testimony at the guilt/innocence phase of the trial that appellant did not dispute that he killed Listvan or that he took Listvan's wallet and car. Appellant maintained, however, that he did not have the requisite intent to be guilty of capital murder.

Appellant did not testify at the punishment phase of his trial. He did request permission of the trial court to make a statement, which the court granted after the jury was discharged. In that statement, appellant expressed regret over Listvan's death but stated that, "I didn't plan for any of that to happen." Accordingly, appellant's statement does not constitute an admission that he committed the crime for which he was charged and convicted, i.e., the crime of capital murder.

We overrule the State's contention that appellant has waived his right to assert any error that may have occurred during the guilt/innocence phase of his trial.

### Sufficiency of the Evidence

In point of error one, appellant argues that the evidence was insufficient to sustain his conviction because the evidence did not show that the robbery (his taking Listvan's wallet and vehicle) took place during the course of Listvan's killing. In point of error two, appellant contends that the evidence was insufficient to sustain his conviction because no rational trier of fact could have reasonably concluded that he had the specific intent to cause the death of Listvan during the course of the robbery. In point of error three, appellant insists that the evidence was insufficient to sustain his conviction because no rational trier of fact could have reasonably concluded that Listvan's killing occurred during the course of the commission of and attempting the commission of a robbery, as

opposed to the commission of a theft of Listvan's wallet and the unauthorized use of Listvan's vehicle.

The relevant inquiry in a legal sufficiency review of the evidence is whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Banda v. State*, 890 S.W.2d 42, 49 (Tex.Crim.App.1994); *Staley v. State*, 887 S.W.2d 885, 888 (Tex.Crim.App.1994); *Green v. State*, 891 S.W.2d 289, 297 (Tex.App.—Houston [1st Dist.] 1994, pet. ref'd). The jury is the sole judge of the weight and credibility of the evidence and the reasonable inferences to be drawn therefrom. *Alvarado v. State*, 912 S.W.2d 199, 207 (Tex.Crim.App.1995). Appellate judges are not factfinders; we may not re-evaluate the weight and credibility of the record evidence. *Id.*

In conducting a factual sufficiency review, we "view all the evidence without the prism of 'in the light most favorable to the prosecution.' ... [and] set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App.1996); *Peoples v. State*, 928 S.W.2d 112, 118 (Tex.App.—Houston [1st Dist.] 1996, pet. ref'd); *Wilkerson v. State*, 920 S.W.2d 404, 407 (Tex.App.—Houston [1st Dist.] 1996, no pet.).

### 1. Did appellant form the intent to rob Listvan before or during the commission of the murder?

■ A person commits the offense of capital murder if he commits murder as defined under TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 1994) and if he intentionally commits the murder in the course of committing or attempting to commit robbery. TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon 1994). The Court of Criminal Appeals has defined "in the course of committing" an offense under section 19.03(a)(2), including

robbery, as conduct occurring in an attempt to commit, during the commission, or in the immediate flight after the attempt or commission of the offense. *Robertson v. State*, 871 S.W.2d 701, 705 (Tex.Crim.App.1993); *Garrett v. State*, 851 S.W.2d 853, 856 (Tex.Crim.App.1993). For a murder to qualify as capital murder under section 19.03(a)(2), the intent to rob must be formed before or concurrent with the murder. *Alvarado*, 912 S.W.2d at 207; *Robertson*, 871 S.W.2d at 705; *Garrett*, 851 S.W.2d at 856. Intent may be inferred from the actions or conduct of the defendant. *Robertson*, 871 S.W.2d at 705.

■ Relying on his own testimony, appellant maintains that his argument with Listvan escalated into a physical confrontation and a killing. According to appellant, the record sufficiently established that he beat Listvan with a coffee mug in an unjustified reaction to Listvan's failure to visit appellant's parents who were in a nursing home. Appellant contends that there is no evidence that showed he killed Listvan with the specific intent to facilitate the taking of Listvan's wallet, vehicle keys, and vehicle; at most, the evidence showed only a homicide and later theft to facilitate his flight from the crime scene.[4]

Appellant argues that *Palafox v. State*, 608 S.W.2d 177 (Tex.Crim.App.1979), and *Ibanez v. State*, 749 S.W.2d 804 (Tex.Crim.App.1986), compel reversal on the issue of intent to commit robbery. We disagree. The holdings in *Palafox* and *Ibanez* rest upon a legal rule that has now been superseded.

In *Palafox*, the Court of Criminal Appeals repeated the "voucher rule," also known as the "*Palafox* rule:"

> It is well stated that "[w]here the state puts in evidence the statements of the accused party which exculpates the accused, and does not directly or indirectly disprove them, the accused is entitled to an acquittal."

608 S.W.2d at 181.

In Palafox's confession, which was introduced into evidence, he said that he and his

---

4. Appellant also points to the cross-examination of Listvan's son, who testified that the drawers in his father's desk, dressers, and filing cabinets had not been emptied or rifled; they all appeared to be in good order.

friend really did not want any of the property they took from the decedent's home after the killing; rather, they wanted to make the crime appear to be a burglary. *Id.* at 179. Finding that Palafox's statements in the confession were exculpatory, the Court of Criminal Appeals held that those assertions had to be disproved beyond a reasonable doubt. *Id.* at 182. It further held that the fact that Palafox took the decedent's property in and of itself did not prove robbery beyond a reasonable doubt because, at most, such evidence only made it "more likely than not" that the murder occurred in the course of a robbery. *Id.* at 182.

In *Ibanez,* four justices and a concurring justice of the Court of Criminal Appeals held that under the *Palafox* rule, the State did not disprove beyond a reasonable doubt the exculpatory matter contained in Ibanez's confession. *Ibanez,* 749 S.W.2d at 808. It is worth noting that in *Ibanez,* there was no evidence that the defendant had taken any property other than the decedent's car. *Id.* at 806. According to Ibanez's confession, he took the car out of fear and, after aimlessly driving for a while, fled to Juarez. *Id.* at 806. There were three dissenters and, on the State's motion for rehearing, a member of the majority joined the dissenters and stated that he believed that the evidence was sufficient to support the conviction, and would grant the motion for rehearing. *Id.* at 812–13 (op. on reh'g).

The Court of Criminal Appeals overturned the voucher rule in *Russeau v. State,* 785 S.W.2d 387, 390 (Tex.Crim.App.1990), holding that the rationale behind this rule is effectively destroyed by TEX.R.CRIM.EVID. 607. *See Coleman v. State,* 832 S.W.2d 409, 414 (Tex.App.—Houston [1st Dist.] 1992, pet. ref'd). The court held that the State is no longer bound by exculpatory statements. Therefore, a jury need not attach equal credit to all parts of a confession, but may accept one portion as true and reject the rest. *See id.*

More recent opinions from the Court of Criminal Appeals are instructive concerning when the evidence is sufficient to support a jury's finding that a defendant is guilty of capital murder, i.e., that a murder occurred in the course of committing and attempting to commit a robbery. In *Nelson v. State,* 848 S.W.2d 126, 132 (Tex.Crim.App.1992), the court reviewed the entire record and concluded that a rational trier of fact could find that the defendant formed the intent to obtain and maintain control of the victim's property before or at the time of the assault:

> Appellant was in financial difficulties, indicating one possible motive for the crime. Appellant went through deceased's property, took some valuables, including a billfold which contained $50.00, and then took Howard's [deceased's] car.
>
> A rational juror might also have inferred from Howard's possession of drugs and appellant's drug use that appellant went to the victim's apartment in order to assault him and take his drugs or to obtain money for drugs. Indeed, appellant's second confession reflects that after leaving the apartment the first thing he did was to get some "chrystal" [sic]. Finally, appellant had ample time and opportunity to familiarize himself with the deceased's property and form the requisite intent.

848 S.W.2d at 132.

In *Alvarado,* the defendant insisted in his statement that he killed the victims in self-defense. 912 S.W.2d at 206. The Court of Criminal Appeals concluded:

> Based on the evidence at trial, a rational jury could have found beyond a reasonable doubt that: (1) the Sustaitas [victims] sold illegal drugs to appellant on more than one occasion; (2) appellant believed they had cheated him on at least one such occasion; (3) on the night of September 22, 1991, appellant, Cameron, and Avila armed themselves with knives and went to the Sustaita residence with the intent to kill the Sustaitas in retaliation for the cheating; and (4) immediately after the killings, appellant, Cameron, and Avila, without discussion, searched the Sustaita residence for things to steal. From these findings, a rational jury could have further found beyond a reasonable doubt that, at or before the time of the killings, appellant formed

the intent to obtain control of the Sustaitas' property.

*Id.* at 207–208.

In *Zimmerman v. State*, 860 S.W.2d 89 (Tex.Crim.App.1993)[5], the defendant argued that the only taking of property described by one of the witnesses occurred after the conclusion of the alleged murder, and not as an integral part of it. The Court of Criminal Appeals disagreed:

> [E]ven if the facts showed that appellant robbed the decedent's body after he had already died, that would not be dispositive. If the State introduces evidence from which the jury could rationally conclude that appellant formed the intent to obtain or maintain control of the victim's property either before or during the commission of the murder, then the State "has proven that a murder occurred in the course of robbery, although the element of appropriation occurred after the murder."

860 S.W.2d at 93.

In this case, a rational trier of fact could have disbelieved appellant's protestations that he had no intention of robbing Listvan before or during the assault and could have determined beyond a reasonable doubt, based on appellant's actions, that he did. Appellant, an admitted drug user, had only $15 or $20 in his pocket the morning of September 29. He had no home, no job, no car, and no support from his family. One of the first things appellant did after killing Listvan was to purchase crack cocaine, get high, and remain so. A rational jury could have concluded that appellant chose to stay near and seek out a man whom he had known for some time, and about whose establishment, assets, vehicles, and personal habits he had knowledge, for the purpose of robbing him to obtain money and a car. Appellant promptly searched Listvan when the latter had either passed out or died, and he did not hesitate to take Listvan's wallet and spend the money he found in it. Clearly, this evidence is legally sufficient to establish that appellant formed the intent to rob List-

van before or during the commission of murder.

We have summarized all the relevant evidence above. In comparing appellant's self-serving testimony about his lack of intent to rob with the inferences to be drawn from his drug use, financial straits, knowledge of Listvan, and prompt search of the body and spending of Listvan's money, the conclusion that appellant formed the intent to rob Listvan before or during the commission of murder is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

We overrule point of error one.

**2. Did appellant specifically intend to kill Listvan?**

 To convict a defendant of capital murder as a primary actor, the jury must find that he intentionally committed the murder **in the course of the underlying felony.** *Lawton v. State*, 913 S.W.2d 542, 555 (Tex. Crim.App.1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 88, 136 L.Ed.2d 44 (1996). Appellant asserts that his testimony, his statement to the police, and his statement to the trial court following the discharge of the jury conclusively establish that he had no intent to kill Listvan. We disagree.

 Intent can be inferred from the acts, words, and conduct of the defendant. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex.Crim. App.1995), *cert. denied*, 517 U.S. 1106, 116 S.Ct. 1323, 134 L.Ed.2d 475 (1996). Intent may also be inferred from the extent of the injuries and the relative size and strength of the parties. *Patrick*, 906 S.W.2d at 487.

Listvan was 69 years old, five feet 11 inches in height, and 151 pounds in weight. Appellant was more than 30 years younger, of slender build, and about five feet five or six inches in height. Dr. Krohn, the assistant medical examiner who performed the autopsy, testified that Listvan had 30 lacerations caused by a blunt object covering both the sides and top of his head, his forehead,

---

5. Judgment vacated on other grounds and cause remanded for further consideration in light of *Johnson v. Texas*, 509 U.S. 350, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993). *Zimmerman v. Texas*, 510 U.S. 938, 114 S.Ct. 374, 126 L.Ed.2d 324 (1993). Judgment subsequently affirmed by Texas Court of Criminal Appeals. *Zimmerman v. State*, 881 S.W.2d 360 (Tex.Crim.App.1994).

his eyes, his right ear, the bridge of his nose, his lips, and his cheeks. Both of Listvan's eyes were blackened, his nose was broken, and his skull was fractured. Parts of his head were actually caved in. Listvan had bruises on his right foot, his upper right arm, and his right index finger. Dr. Krohn testified that Listvan's death was caused by "multiple blunt trauma to the head." She could not tell if one blow could have caused his death, but clearly the combined effect of 30 blows and the blood loss caused his death. Officer Kay testified that the location of the blood splatters at the crime scene indicated that appellant may have changed hands while he was hitting Listvan.

Given the respective ages of Listvan and appellant, the number of blows to Listvan's head, the severity of Listvan's injuries, including the caving in of his skull and the amount of blood sprayed and splattered over the floors and walls, and the testimony that appellant may have changed hands while hitting Listvan, a rational jury could have concluded beyond a reasonable doubt that appellant intended to murder Listvan.

We have summarized all the relevant evidence above. In comparing appellant's self-serving testimony about his lack of intent to kill with the inferences to be drawn from the number of blows Listvan received, the severe bodily injuries Listvan sustained, and the extent of the blood spatters, the conclusion that appellant intended to murder Listvan is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

We overrule point of error two.

**3. Did the killing of Listvan occur during a robbery as opposed to during a theft and unauthorized use of motor vehicle?**

In our discussion of appellant's first point of error, we concluded that a rational trier of fact could have found beyond a reasonable doubt that appellant had the requisite intent to rob Listvan before or during the commission of murder. Accordingly, we overrule point of error three.

## Admissibility of Appellant's Written Statement to Police

In point of error five, appellant contends that the trial court erred in failing to enter a written order containing findings of facts and conclusions of law regarding the disputed circumstances surrounding the taking of appellant's written confession and its voluntariness. In point of error six, appellant argues that the trial court committed reversible error in refusing to grant his written motion to suppress his written statement to the police, on the grounds that it was involuntary because it was the product of improper inducement on the part of the homicide detective.

Appellant moved to suppress his custodial statement because it was not voluntarily made. A hearing was held on the motion on March 6, 1995. Sergeant Burmester, Officer Fincher, Sergeant Vachris, and appellant testified at the hearing. At the end of the hearing, the trial court found that appellant's statement was voluntarily made and was admissible. The trial court dictated findings of facts and conclusions of law into the record.

**1. Did the trial court enter an order with findings of facts and conclusions of law as required by TEX.CODE CRIM.P.ANN. art. 38.22, § 6 (Vernon 1979)?**

When the trial court finds a defendant's written statement to be voluntary, and thus admissible, TEX.CODE CRIM.P.ANN. art. 38.22, § 6 (Vernon 1979) requires the trial court to enter an order stating such conclusion, along with specific finding of facts, and to file the order among the papers of the cause. Appellant maintains that the trial court in this case did not enter such a written order and that such failure was error.

While it is true that the trial court did not enter a separate order, the trial judge dictated a statement into the record at the conclusion of the hearing on appellant's motion to suppress. In the statement, the trial court concluded that appellant had made his custodial statement freely and voluntarily with a clear understanding of what he was doing and without threats or promises; that appel-

lant was given *Miranda*[6] warnings and the opportunity to read the warnings himself; that appellant understood the *Miranda* warnings and voluntarily waived his right to a lawyer and the right to be silent; and that appellant did not attempt to stop or terminate the interview.

The Court of Criminal Appeals and several appellate courts have all held that a trial court complies with article 38.22, section 6 when the judge dictates his findings of facts and conclusions of law to the court reporter and they are later transcribed as part of the statement of facts. *Parr v. State*, 658 S.W.2d 620, 623 (Tex.Crim.App.1983); *Amunson v. State*, 928 S.W.2d 601, 608 (Tex.App.—San Antonio 1996, pet. ref'd); *Perkins v. State*, 779 S.W.2d 918, 925 (Tex.App.—Dallas 1989, no pet.); *Horn v. State*, 699 S.W.2d 714, 716 (Tex.App.—Fort Worth 1985, no pet.); *see Fuentes v. State*, 846 S.W.2d 527, 530 n. 1 (Tex.App.—Corpus Christi 1993, pet. ref'd) (noting that trial court's method of dictating findings into the record sufficient compliance with art. 38.22, sec. 6). We follow the holding of the Court of Criminal Appeals and find that the trial court adequately complied with article 38.22, section 6.

We overrule point of error five.

### 2. Was appellant's written statement to the police made voluntarily?

■ On appeal, challenges to the voluntariness of a confession generally should be directed to whether the court abused its discretion in one of the findings of fact or whether the court properly applied the law to the facts. *Sinegal v. State*, 582 S.W.2d 135, 137 (Tex.Crim.App.1979); *see Sosa v. State*, 845 S.W.2d 479, 485 (Tex.App.—Houston [1st Dist.] 1993, pet. ref'd). The judge at a suppression hearing is the sole judge of the weight and credibility of the witnesses: he may believe or disbelieve any part of any witness's testimony. *Johnson v. State*, 698 S.W.2d 154, 159 (Tex.Crim.App.1985); *Snow v. State*, 721 S.W.2d 943, 946 (Tex.App.—Houston [1st Dist.] 1986, no pet.).

■ Relying on his own testimony at the suppression hearing, appellant argues that

his written statement was induced by the police, as follows:

Prosecutor: You remember it?

Appellant: Yes, I do, but like I said, as far as the when I did answer, I asked 'em if I should have a lawyer first and that's when Officer Finch I think.

Q: Fincher.

A: Okay. Said, you know, he said that the—the most memorable thing that I remember him saying was, that I tell you what, you don't—you look like you're pretty bothered by this, some sort of thing like that, and then—that if I was you, I would—I would tell what I knew to get it off my chest, so that I would feel better.

Q: Had you told Officer Fincher that you were bothered by what you had done?

A: Oh, yes.

Q: You did tell him that, didn't you?

A: I believe so.

Q: Well, Mr. Lee, my question to you is, did you make up your own mind to give these police officers a statement?

A: Huh, after I—asked his advice. I did.

Q: Then you made up—you made the decision yourself, didn't you?

A: Well, with suggestion I did, yes, ma'am, I did.

Q: And the suggestion was that you would feel better if you told what happened?

A: Yes.

Although appellant contends that he was induced by police officers into signing a confession so that he would "feel better," appellant also testified that no one forced him to make a statement, no one promised him anything, and no one hurt him. This statement corroborated the testimony of Sergeant Burmester and Officers Fincher and Vachris. In fact, appellant characterized the police officers as polite and friendly and commended them on their actions.

In response to the prosecutor's question, appellant denied that he was asserting that the police officers put the words in the statement "in [his] mouth." The prosecutor commented:

---

**6.** *Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

You took some time earlier today and read through these three pages of your statement. . . . It seemed, Mr. Lee, that most of the information that you gave or that is in this written statement you don't have any argument with it.

Appellant agreed that he did not have a problem with "a lot of it," but went on to say that "[a] lot of it just doesn't explain it, I guess the way I remember it happening to the exactness that I do remember."

Burmester testified that on the evening of appellant's arrest, when he and appellant were in a room at the homicide division of the police station, he pulled up the custodial statement form on the computer. The *Miranda* warnings appeared at the top of the form. Burmester stated he went through each one with appellant, and appellant affirmatively responded that he understood each one of the rights read to him.

Vachris testified that he went through the completed statement with appellant and asked appellant if he had read the entire statement. Appellant responded affirmatively. Vachris asked appellant to read one of the *Miranda* warnings, which he did. Having verified that appellant could read, Vachris asked him to initial all the *Miranda* warnings to indicate that he understood them and had no questions. Appellant did so. Vachris asked appellant if he wished to make any changes in the statement. Appellant replied that the changes had already been made.

Appellant did not contradict the testimony of Burmester and Vachris. He stated only that he did not remember either Fincher's giving him *Miranda* warnings at the time he was arrested or Vachris's asking him to initial the *Miranda* warnings to signify that he understood them.

Both on direct and cross-examination, appellant complained that at the time he gave the statement, he had been sleepless for a couple of days. He indicated that his sleepless state affected the quality of his statement. Neither Burmester nor Fincher recalled if appellant told them that he had not slept for a couple of days.

Appellant and Fincher agreed that at some point before appellant gave any statement, he asked Fincher for advice about what he should do. Their recollections differed as to Fincher's response. According to appellant, Fincher told him that if he (Fincher) were in appellant's shoes, he would "get it off his chest" so that he would feel better. According to Fincher, he told appellant that appellant had to do what he thought he needed to do.

Burmester described the procedure he, Fincher, and appellant followed in drafting the statement. First, Burmester asked appellant for biographical data. Then Burmester and Fincher went over the details of the killing with appellant. Sometimes appellant spoke in a narrative, and sometimes the officers asked questions. Appellant watched what Burmester was typing over his shoulder. When Burmester finished, he printed a copy of the statement for appellant to read. Burmester then left the room and returned only after Fincher called him back in to make some changes appellant had requested. Burmester reprinted the statement with the changes and gave it to appellant. Appellant made no further changes.

We conclude, based on the testimony from the suppression hearing, that the trial court did not abuse its discretion in determining that appellant made his statement to the police freely and voluntarily. The trial court was not obligated to believe appellant when he asserted that Officer Fincher had "induced" him into making the statement so that he would "feel better" and get the matter "off his chest."

Furthermore, even if Fincher made the statements appellant claimed he did, such statements cannot be construed as a promise or inducement. Similar to the facts in *Chambers v. State*, 866 S.W.2d 9, 20–21 (Tex. Crim.App.1993), Fincher made no promise; he offered a "cliche," i.e., that appellant would feel better if he confessed. Moreover, an untruthful confession was not produced. Appellant agreed that while the confession lacked some detail, it was essentially correct. *See Snow*, 721 S.W.2d at 946 (a confession induced by deception or trickery is not inadmissible unless the method used was calculat-

ed to produce an untruthful confession or was offensive to due process).

We overrule point of error six.

### Improper Jury Argument

■■■ In point of error four, appellant urges that the trial court committed reversible error in overruling his objection when the prosecutor improperly argued outside the record that appellant went to Listvan's home to rob him in order to obtain money to purchase crack cocaine.

In closing argument by the State, the prosecutor stated:

> But maybe a more reasonable scenario would be that when he [appellant] went to Mr. Listvan, a person he knew to be a kind and giving person who he had known for many years ... well, maybe he thought that maybe Mr. Listvan might be willing to give him some cash to get him going and get him cocaine because isn't that really what this is all about?

Defense counsel objected on the ground that the statement was not a fair rendition of the evidence. The court overruled the objection.

■■■ Permissible jury argument must fall into one of four general areas: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement. *Richardson v. State,* 879 S.W.2d 874, 881 (Tex.Crim.App.1993); *Sawyer v. State,* 877 S.W.2d 883, 884 (Tex.App.— Houston [1st Dist.] 1994, pet. ref'd). All reasonable inferences may be drawn from the facts in evidence that are "reasonable, fair, and legitimate," but jury argument may not be used, either directly or indirectly, to get evidence before the jury that is outside the record. *Sawyer,* 877 S.W.2d at 887. Counsel is generally afforded wide latitude in drawing inferences from the record, as long as such inferences are reasonable and offered in good faith. *Cantu v. State,* 842 S.W.2d 667, 690 (Tex.Crim.App.1992).

Appellant testified that he was in the habit of using cocaine and that on the morning of September 29, but not the afternoon, he was under the influence of alcohol or drugs. On September 29, appellant was also unem-

ployed, had been for about a month, and was living in a vacant house without electricity or water. Appellant also testified that shortly after killing Listvan and leaving the scene, he went to a crack house and purchased cocaine. He sat in the bathroom for a long time "smoking." The prosecutor reasonably inferred from appellant's testimony that he was a regular user of cocaine and needed money, certainly more money than the $15 or $20 he had in his pocket, to purchase cocaine.

We overrule point of error four.

We affirm the judgment of the trial court.

SCHNEIDER, C.J., and O'CONNOR, J., also participating.