NUMBER 13-00-001-CR




COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI


___________________________________________________________________


HUBERT FOSTER
, Appellant,


v.



THE STATE OF TEXAS
, Appellee.

___________________________________________________________________


On appeal from the 147th District Court


of Nueces County, Texas.


____________________________________________________________________


O P I N I O N



Before Chief Justice Seerden and Justices Dorsey and

Rodriguez

Opinion by Justice Rodriguez



 A grand jury indicted Hubert Foster, appellant, for capital murder,
alleging he intentionally caused the death of Ruben Lopez by strangling
him with a shirt while in the course of committing or attempting to
commit robbery and kidnapping. Tex. Pen. Code Ann. § 19.03 (a)(2)
(Vernon 1994). After a jury trial, appellant was found guilty of capital
murder and sentenced to life imprisonment. Appellant complains on
appeal that the evidence was factually insufficient to prove he
intentionally caused the death of Lopez. We affirm.

 Lopez was found dead in a motel room in Corpus Christi on
January 1, 1999. His body was discovered laying face down, with his
hands tied behind his back, his feet bound together, and a shirt tied
around his neck. According to Dr. Lloyd White, Nueces County Medical
Examiner, Lopez died from asphyxia by ligature. Lopez also suffered
abrasions, bruises, a puncture wound, and internal injuries. The motel
room was ransacked and blood was found on various items in the
room, including broken pieces of chairs.

 On January 3, 1999, police officers in Houston arrested appellant,
who was driving Lopez's car, after he led them on a car and foot chase. 
Appellant was transported to Corpus Christi, and there gave a
confession in which he admitted struggling with Lopez in the motel
room because he had refused to pay Sugar, a prostitute, for services
rendered. Appellant admitted he and Sugar tied Lopez up and gagged
him. He claimed he did not intend to hurt or kill Lopez, but only wanted
the money owed.

 In his sole issue, appellant contends the evidence is factually
insufficient to support a finding that he intentionally caused the death
of Lopez. When reviewing factual sufficiency, we view all of the
evidence and set aside the verdict only if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and
unjust. Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000); Cain
v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997); Clewis v. State,
922 S.W.2d 126, 135 (Tex. Crim. App. 1996). We must accord proper
deference to the jury's determination and avoid substituting this Court's
judgment for that of the jury. Cain, 958 S.W.2d at 407. 

 To prove capital murder as alleged in the indictment, the State
was required to prove appellant intentionally caused the death of Lopez
and did so during the course of committing or attempting to commit
kidnapping or robbery. Tex. Pen. Code Ann. §§ 19.02(b)(1), 19.03(a)(2)
(Vernon 1994). Appellant's challenge to the sufficiency of the evidence
is limited to whether he possessed the requisite mental state. A person
acts intentionally when it is his conscious objective or desire to engage
in the conduct or cause the result. Tex. Pen. Code Ann. § 6.03(a)
(Vernon 1994). Intent may be inferred from the words, actions, and
conduct of appellant. Robertson v. State, 871 S.W.2d 701, 705 (Tex.
Crim. App. 1993). It may also be inferred from the extent of the injuries
and the relative size and strength of the parties. Patrick v. State, 906
S.W.2d 481, 487 (Tex. Crim. App. 1995). Furthermore, the means used
to cause the death may be considered in determining intent. Semento
v. State, 747 S.W.2d 415, 420 (Tex. App.­Dallas 1988, pet. ref'd). 

 The State presented evidence at trial that employees of the motel
found Lopez in his room, face down on the floor next to the air
conditioner, with his hands tied behind his back and a towel or piece of
cloth tied around his neck. Michael Hernandez, a captain with the
Corpus Christi Fire Department, testified he was the first medic on the
scene. He noted the victim had his hands and legs tied. When asked
about checking for Lopez's pulse, Hernandez testified:

 Actually, because of the condition of the ­ of the
victim, I couldn't really check his pulse, because
there was ­ I believe there was some rope in the
way. So I checked what we call "brachial artery"
right here (indicating), and I couldn't feel
anything. And I had to work my hand ­ my gosh,
it's been a while. But I remember there ­ either a
towel or some clothing wrapped around his face,
so I had to kind of wedge my fingers up
underneath his clothing to feel around his neck
area. 


 Karen Barnes, a crime scene technician, testified there were items
spread about the floor as if the room had been ransacked. The dresser
drawers were open and a pair of jeans had its pockets turned out. There
was a chair and broken pieces of a chair with blood on them on the
carpet. Lopez's body was facing down, his wrists were tied behind his
back, and he had what appeared to be a shirt wrapped around his neck
and head area. A pair of gray sweatpants covered the victim's neck and
head area. A leather belt and a piece of fabric from a shirt were
removed from Lopez's wrists. A nylon rope or cord was removed from
Lopez's ankles. He had marks on his back as if he had been injured in
a struggle or fight. 

 Huy Nguyen, a forensic scientist for the Texas Department of
Public Safety, performed a D.N.A. analysis of samples of blood taken
from appellant, Lopez, and Sugar and compared it with blood taken
from the crime scene. According to Nguyen, there was blood from all
three individuals in the motel room. 

 Dr. White testified the cause of Lopez's death was asphyxia by
ligature, and that "[t]he ligature was a shirt which had been tied very
tightly around the neck." The shirt had been tied around the neck by
means of a large, very hard, complex knot in the back. He was not able
to insert his fingers between the ligature and the skin of the neck
without great difficulty. A pair of sweat pants had also been tied
loosely over the shirt. There were abrasions and bruises on the ankles
and an abrasion on the back of the right heel. There were abrasions
and bruises on other parts of the body as well. 

 In his confession, appellant stated he was with Sugar on January
1, 1999. Lopez promised to pay Sugar $150 for services rendered, but
only paid her $20. When appellant asked Sugar what happened, she
told him that she smoked some crack and that Lopez told her he
wanted a girl who did not use dope. Around 3:30 a.m., appellant and
Sugar went to the motel to collect the money owed to Sugar. They
knocked on Lopez's door, Lopez opened it, and Sugar and appellant
entered the room. Appellant had a rag with a rope around it. Appellant
told Lopez he owed some money, to which Lopez replied, "you're
right." Lopez then walked over to a table like he was going to get his
wallet, but instead got a knife and said, "you ain't going to get no more
money." Lopez tried to force appellant out of the room with the knife,
but appellant stayed, insisting he was not leaving until Sugar got her
money. The two men struggled for the knife, and Sugar helped
appellant, permitting appellant to get the knife. 

 Eventually appellant had Lopez on the floor, with the knife to
Lopez's head, throat, and genitals. Appellant begged Lopez to stop
resisting because all he wanted was what Sugar had coming, and he
did not want to hurt him. 

 Lopez then assented to give appellant the money, so appellant let
him get up. Lopez then grabbed a chair and swung it at appellant,
hitting him and causing him to drop the knife. Lopez picked up the
chair again and hit Sugar with it, causing her to bleed. Lopez grabbed
Sugar by the hair. As Lopez and Sugar were wrestling, appellant
grabbed the chair and hit Lopez with it. Lopez did not let go of Sugar
so appellant hit him again with the chair. This blow sent Lopez to the
floor, and appellant got on his back. Sugar then hit Lopez with the
chair. Appellant told Sugar to tie appellant's legs, which she did using
a rope. Appellant put Lopez's hands behind his back and tied them
together with a belt. Lopez did not resist. Sugar cut a shirt that was
in the room and used the strips of shirt to further bind his hands. 
Appellant attempted to gag Lopez with a towel, but because the towel
was choking him, appellant slid the towel down and gagged him with
something else. Appellant told Sugar, "Let's get the hell out of here." 


 Sugar took the keys to Lopez's car, his wallet, and some jewelry
and appellant grabbed two of his shirts. As appellant left, Lopez was
mumbling and kicking the air conditioner. He was trying to yell, but
was unable because he was gagged. 

 Appellant and Sugar left in Lopez's car and the two started
crying. Appellant wanted to call the motel and let them know Lopez
was there, but he was too scared. He started praying for Lopez aloud,
saying "please God, let him be alright." 

 Sugar and appellant drove to someone's house and traded Lopez's
jewelry for some narcotics. Appellant threw Lopez's cell phone out of
the car because he thought it had a tracer on it and he believed the
police were already looking for them. They headed for Houston. When
they arrived in Houston, appellant thought the police were already
looking for the car because he was sure Lopez had told the police about
Sugar and they would be looking for them. Sugar and appellant got a
room at a hotel, and called an acquaintance in Corpus Christi who told
them of Lopez's death. They started "freaking out" and crying. 
Appellant could not believe Lopez was dead and wondered if Lopez died
by choking on the gag or if he had had a heart attack because he was
fine when appellant left the motel room. 

 Sugar and appellant were driving around Houston when a police
officer pulled them over. The officer walked up to the car and pointed
at appellant. Appellant drove away. As the police chased them,
appellant and Sugar agreed to kill themselves by crashing the car. 
However, the car got a flat tire, so they fled on foot. The officers found
appellant in a backyard. When the officers pointed their guns at
appellant, he pulled out a knife and pointed the wooden part of the knife
towards them so they would think he had a gun and shoot him. The
officers, however, arrested appellant.

 Appellant concluded his confession by stating he never intended
to hurt Lopez and was sorry he was dead. He only wanted what was
owed to Sugar. 

 Appellant urges that the evidence shows he did not have a
conscious objective and desire to cause the death of Lopez at the time
he tied him up. As appellant notes, there is evidence Lopez tried to free
himself. Dr. White testified some of the bruises and abrasions on
appellant could have been caused by appellant trying to free himself. 
According to appellant, abrasions on Lopez's feet, forearm, and hand
could have been caused by Lopez attempting to free himself by rubbing
against the air conditioner or other object. There was blood found on
the air conditioner. While this evidence may tend to show Lopez tried
to free himself and was not dead when appellant left the room, it does
not negate intent. The fact-finder could have reasonably inferred
appellant intended to kill Lopez by leaving him to die in the room. 

 Appellant further directs this Court to evidence that he was afraid
the police would be looking for him and Sugar because Lopez would tell
them about Sugar. According to appellant, this evidence tends to show
appellant did not intend to kill Lopez because he believed Lopez to be
alive after he left. Appellant also notes he stated he did not wish for
Lopez to die, but only wanted Sugar's money. 

 Appellant's admission that he prayed to God for Lopez to be alive
arguably rebuts the assertion that he believed him to be fine when he
left the motel room. Moreover, the jury could have reasonably inferred
that appellant's concern that the police would be looking for him arose
not out of fear that Lopez would talk to the police, but rather out of fear
that the police would find Lopez's body and tie his death to appellant
and Sugar. The trier of fact is the sole judge of the witness's credibility
and may believe or disbelieve any part of a witness's testimony. 
Haskins v. State, 960 S.W.2d 207, 209 (Tex. App.--Corpus Christi 1997,
no pet.). Furthermore, a jury need not believe all parts of a confession,
it may accept one portion and reject the rest. Lee v. State, 964 S.W.2d
3, 9 (Tex. App.--Houston [1st Dist.] 1997, pet. ref'd). The jury was free
to disregard appellant's self-serving testimony that he believed Lopez
was alive and that he did not intend to kill him, and make reasonable
inferences from appellant's actions.

 Appellant also maintains the evidence is conflicting as to whether
the ligature around Lopez's neck was tight. Appellant contends Dr.
White's testimony regarding the tightness of the ligature conflicts with
the testimony of the first medic on the scene, who did not say the
ligature was tight. In fact, the medic testified that at first he was
unable to get a pulse, and he had to work his fingers up under the
clothing to get to the neck area. We are unable to see how this
testimony conflicts with Dr. White's testimony that the ligature was
very tight and that he could not insert his fingers between the ligature
and the skin of the neck without great difficulty. 

 Finally, appellant maintains the evidence supports a finding that
he only intended to gag Lopez, and not kill him. Appellant contends the
shirt wrapped around appellant's neck was not a device typically used
to kill someone by strangulation. According to appellant, if he had
intended to murder Lopez, he would have tied the nylon rope around his
neck rather than the shirt. Appellant claims the shirt ligature was
probably used to secure the more loosely tied garment placed over
Lopez's head to gag him. 

 When asked whether Lopez had been gagged, Dr. White replied,
". . . with respect to whether or not something had been placed in the
mouth, . . . that was not the case when I examined him." The shirt
was tied around the neck by means of a large, hard, complex knot in
the back. There were scratches on the front of the neck and substantial
contusions and hemorrhaging around the larynx and the muscles on
the side of the neck. Lopez had abrasions and bruises about his body,
and was found with his feet and hands tied. Considering appellant's
actions, the extent of Lopez's injuries, and the means of Lopez's death,
and according proper deference to the finder of fact, we cannot say the
verdict is so contrary to the overwhelming weight of the evidence as to
be clearly wrong and manifestly unjust. Appellant's sole issue is
overruled. 

 

 The judgment of the trial court is AFFIRMED. 

 NELDA V. RODRIGUEZ

 Justice



Do not publish.

Tex. R. App. P. 47.3.


Opinion delivered and filed

this the 28th day of December, 2000.