NUMBER 13-07-0049-CR

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG 

 

 

RUBEN ALEMAN A/K/A "MADDY" Appellant,

v.

THE STATE OF TEXAS, Appellee.

 

On appeal from the 156th District Court 

of Bee County, Texas

 

MEMORANDUM OPINION

Before Justices Yañez, Rodriguez, and Vela

Memorandum Opinion by Justice Vela

 A jury convicted appellant, Ruben "Maddy" Aleman, of murder (1) and engaging in
organized criminal activity, (2) and assessed punishment at life imprisonment on both counts. 
By three issues, appellant complains 1) the evidence is legally and factually insufficient 
to support the verdict, 2) the trial court erred in failing to sua sponte grant a mistrial, and
3) the punishment was disproportionate to the seriousness of the offense. We affirm.

A. Background

1. Facts Surrounding the Murder

 On April 17, 2005, Rebecca Rodriguez, Raymond Lemon, John Phillip Aleman
(John Phillip), Anna Farias, and appellant attended a dance at a Beeville nightclub called
the "Chick-A-Saw." Appellant was an "Hermandad de Pistoleros Latinos" (HPL) gang
member, and his nephew, John Phillip, was a "prospecto" of HPL, a prospective member
who had not yet earned his HPL membership. Two other HPL members, Johnny Villareal
and Joe Quin Villareal, were also present at the nightclub.

 That evening, Donald Bonham, also an HPL member, entered the Chick-A-Saw's
bar without acknowledging his fellow HPL members. Bonham, who had recently been
released from prison, had renounced his HPL membership. Pursuant to HPL rules, a
renouncement meant Bonham had a "green light," which the gang defined as "marked for
death" by other HPL members.

 About midnight, Pedro Pena saw a man with an open knife in his hand leave the
Chick-A-Saw bar. Outside the bar, he saw the man with the knife, along with two or three
other men, fighting with Bonham. Bonham appeared to be trying to retreat from the men
and "fight them off." Pena saw Bonham trip over a curb, and then he saw that Bonham
had been shot. Appellant, John Phillip, Johnny Villareal, Joe Quin Villareal, and Bonham
were later identified as participants in the fight, which resulted in Bonham's death.

 That night, Carrie Campos was babysitting at Lemon's apartment. About 1:40 a.m.,
appellant, Rodriguez, Lemon, John Phillip, and Farias "rushed" into the apartment. They
appeared "scared" or "nervous." Even though someone turned off the lights, Campos,
aided by the light from the TV, saw a rag wrapped around appellant's hand. His shirt was
ripped open, and he had a cut lip. Frightened by what she saw, Campos told Rodriguez
she wanted to go home. While Campos and Rodriguez were outside the apartment,
Lemon came out, locked the door behind him, and told Rodriguez they needed to hide the
cars. Campos left in her car, and Lemon and Rodriguez left quickly in separate cars.

 On Monday, April 18, 2005, Rodrigo Chapa picked up appellant and drove to their
work site. When they stopped for breakfast, he saw scratches on appellant's face. 
Appellant laughed when Chapa teased him about being in a "cat fight" with his girlfriend. 
That morning, two police officers came by looking for appellant, but appellant had
disappeared from the job site. After work, as Chapa was driving off the job site, he saw
appellant approaching his vehicle, yelling at him to stop. Chapa asked him what was going
on, and he replied that he had "problems." 

 Rebecca Rodriguez, appellant's niece, testified that on the night of the murder, she
and Raymond Lemon were at the Chick-A-Saw Bar. On the way there, they picked up
appellant, John Phillip, and Anna Farias. During the dance, Farias pointed to Bonham,
who stood at the bar wearing a white hat. As they left the bar, Rodriguez saw Johnny
Villareal and Joe Quin Villareal running across the street toward Bonham. Rodriguez,
Lemon, and Farias got into the car. Appellant and John Phillip then got into the car, and
they went to Lemon's apartment. There, Rodriguez saw a cut on appellant's face. She
also saw a stab wound on the side of his abdomen.

2. The Investigation and Autopsy

 Officer Jason Alvarez gathered evidence from the crime scene. He found two
knives, a cell phone, blood, a white cowboy hat, and two brass casings from a .22
Remington gun. During the search of Joe Quin Villareal's car, officers found a .22 gun in
the glove compartment. In the trunk, they found a silver-plated .380 pistol, numerous
boxes of ammunition, a stolen Benelli shotgun, large amounts of marihuana, a digital scale,
and a white envelope containing HPL's constitution.

 A forensic firearm and tool marks examination confirmed that the gun that was
found in the glove compartment of Joe Quin Villareal's car was the weapon that killed
Bonham. A forensic serology examination confirmed that DNA blood tests on materials
and clothing found at the scene positively identified appellant's blood on the front of
Bonham's jeans.

 Bonham's autopsy showed he had fourteen sharp-force injuries caused by a sharp-edged weapon, two gunshot wounds, and abrasions. Several wounds on his left forearm
were defensive, and his thigh had an abrasion as if hit by an object. He had a cut on the
side of his face and earlobe. Death was caused by multiple, close-range gun-shot wounds
in combination with sharp-force injuries caused by a knife.

3. Details on HPL

 Officer Reagan Scott testified that HPL is a prison-and-street gang that is primarily
involved in narcotics sales and transporting firearms and illegal immigrants. He stated that
Johnny Villareal, the gang's local boss, agreed to act as a confidential informant and give
information about gang activities. The morning after Bonham's murder, Scott and Villareal
had a meeting, at which time Villareal identified appellant, John Phillip, and Joe Quin
Villareal as those involved in the murder. Johnny Villareal told Scott that John Phillip was
not actually a gang member; rather, he was a "prospecto." To earn gang membership, a
prospecto must do a "good act" or "honorable act," which means some type of aggravated
assault. 

 Clemente Rodriguez, a TDCJ security threat group coordinator, testified he was
familiar with prison gangs, including HPL. He confirmed that Bonham was an HPL member
and that while in prison, he tried to leave HPL by signing a "renouncement" form. 
Rodriguez stated that if an HPL member refused to participate in the gang, he is marked
to be killed. If an HPL member gets out of jail and does not report to HPL immediately, he
is considered "AWOL per HPL regulations," and the "only way out is death." He also
testified that a "green light" means that an individual is marked for death and that if a
person has a "green light" and does not talk to other HPL members, as Bonham failed to
do, it is perceived as shunning and disrespecting the other members which Rodriguez said
"is a very dangerous thing to do." He further testified that appellant had been an HPL
member since 1990. Rodriguez stated that if John Phillip was involved in the murder, he
would automatically be validated and would become an HPL member.

4. Appellant's Voluntary Statements and Testimony

 Appellant gave two voluntary statements. In one statement, he acknowledged a cut
on his face, but did not admit that he was involved in a fight. He claimed to have cut his
face on barbed wire. In the other statement, he stated that while at the dance, Johnny
Villareal approached his table and said, "[W]e have to take care of business." Appellant
told him to "hold up, man, I ain't going to do nothing I ain't supposed to do." Appellant went
outside, saw the fight, and ran to the fight in order to grab John Phillip. He stated that John
Phillip was trying to break the fight up, too. He told John Phillip to "get out of there." 
During the fight, appellant was stabbed, thus explaining how his blood got onto Bonham's
jeans. He did not know who stabbed him, but stated that he fell on top of Bonham when
he was stabbed. When he was getting up, he saw Johnny stabbing Bonham. He then saw
Joe Quin Villareal shoot Bonham twice. Appellant stated that he said, "hey, man, that's
enough, man." Afterwards, appellant ran to Rebecca Rodriguez's car, went to her house,
and cleaned up. He burned his clothes at his mother's house. He stated that Johnny
ordered the hit "cause something to do with that dude, Donald, something in prison,
something happened in prison. And it came out that they wanted him out of the way." 
Appellant stated that John Phillip was not an HPL member. 

 At the guilt/innocence phase, appellant testified he knew Bonham had a "green
light," but did not know he was going to show up at the Chick-A-Saw Bar. When he saw
Bonham enter the bar, he hoped HPL members did not see Bonham. At some point during
the night, appellant saw everyone going into the restroom. He followed them inside and
heard them discussing "who was going to do what." When Johnny Villareal gave John
Phillip a gun, appellant said no, took the gun from John Phillip, and gave it back to Johnny. 
Appellant left the restroom and later saw people fighting outside. He went to the fight to
see if John Phillip was involved. As he approached, he saw Johnny Villareal, John Phillip,
and Joe Quin Villareal fighting with Bonham. Appellant told John Phillip to "get back in the
car," but John Phillip ignored him. Appellant saw Joe Quin Villareal shoot Bonham, who
had a knife. While appellant was trying to get John Phillip out of the way, appellant tripped
and was stabbed by Johnny Villareal because appellant refused to participate in Bonham's
murder. Appellant and Bonham fell on each other. Afterwards, appellant ran from the
scene.

 Appellant stated he joined HPL in 1987 and that he had convictions for aggravated
assault, burglary of a building, and burglary of a habitation. He also stated that once a
person is in HPL, the only way out is to be killed. He said that contrary to John Phillip's
desires, he did not want him to join HPL. 

B. Sufficiency of the Evidence

 By his first issue, appellant challenges the legal and factual sufficiency of the
evidence to support the verdict. In reviewing the legal sufficiency of the evidence to
support a conviction, we view all the evidence in the light most favorable to the verdict in
order to determine whether any rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319
(1979); Hampton v. State, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005). This standard
gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony,
to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate
facts. Jackson, 443 U.S. at 319. The trier of fact is the sole judge of the weight and
credibility of the evidence. Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979);
Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Thus, when performing
a legal-sufficiency review, we may not re-evaluate the weight and credibility of the evidence
and substitute our judgment for that of the fact-finder. Dewberry v. State, 4 S.W.3d 735,
740 (Tex. Crim. App. 1999). We must resolve any inconsistencies in the evidence in favor
of the judgment. Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000). 

 When reviewing the factual sufficiency of the evidence, we view all the evidence in
a neutral light, favoring neither party. Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim.
App. 2006); Drichas v. State, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005). We will set
aside the verdict only if: (1) the evidence supporting the conviction, although legally
sufficient, is nevertheless so weak that the fact-finder's determination is clearly wrong and
manifestly unjust; or (2) the verdict is against the great weight and preponderance of the
evidence. Watson, 204 S.W.3d at 414-15, 417; Johnson v. State, 23 S.W.3d 1, 11 (Tex.
Crim. App. 2000). We cannot conclude a conviction is "clearly wrong" or "manifestly
unjust" simply because we would have voted to acquit. Watson, 204 S.W.3d at 417. In
other words, we may not simply substitute our judgment for the fact-finder's judgment. 
Johnson, 23 S.W.3d at 12; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). 

 To reverse for factual sufficiency, we must determine, with some objective basis in
the record, that the great weight and preponderance of the evidence contradicts the
verdict. Watson, 204 S.W.3d at 417. In examining a factual sufficiency challenge, we
defer to the fact-finder's determination of the credibility of the evidence. Swearingen v.
State, 101 S.W.3d 89, 97 (Tex. Crim. App. 2003).

1. Murder

 A person commits murder if he or she intentionally or knowingly causes the death
of an individual. Tex. Penal Code Ann. § 19.02(a) (Vernon 2003). (3) Intent can be inferred
from the defendant's acts, words, and conduct. Patrick v. State, 906 S.W.2d 481, 487
(Tex. Crim. App. 1995); Lee v. State, 964 S.W.2d 3, 8 (Tex. App.-Houston [1st Dist.] 1997,
pet. ref'd).

 Here, the jury charge included an instruction on the law of parties. A person is
"criminally responsible as a party to an offense if the offense is committed by his own
conduct, by the conduct of another for which he is criminally responsible, or by both." Tex.
Penal Code Ann. § 7.01(a) (Vernon 2003). A person is criminally responsible for an
offense committed by another if, "acting with intent to promote or assist the commission
of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person
to commit the offense." Id. § 7.02(a)(2). "Each party to an offense may be charged with
commission of the offense." Id. § 7.01(b).

 While the presence of an accused at the scene of an offense is not alone sufficient
to support a conviction, it is a circumstance tending to prove guilt, which, combined with
other facts, may suffice to show that the accused was a participant. Beardsley v. State,
738 S.W.2d 681, 685 (Tex. Crim. App. 1987). Further, participation in an enterprise may
be inferred from circumstances and need not be shown by direct evidence. Id. at 684.

 In this case, a rational jury could have determined the following from the evidence:
(1) appellant was a long-time HPL member; (2) the only way out of HPL was to be killed;
(3) Bonham, by renouncing his HPL membership, had a "green light," which meant he was
marked for death by other HPL members; (4) Bonham showed up at the bar without
acknowledging his fellow HPL members; (5) appellant saw Bonham at the bar and knew
Bonham had a "green light;" (6) Johnny Villareal and Joe Quin Villareal were HPL
members; (7) they and appellant were at the nightclub the night of Bonham's murder; (8)
on the night of the murder, Pena saw Bonham fighting with three or four other men outside
the club; (9) Pena testified Bonham appeared to be trying to both retreat from the men and
"fight them off;" (10) appellant, John Phillip, Johnny Villareal, Joe Quin Villareal, and
Bonham were later identified as participants in the fight which resulted in Bonham's death;
(11) at approximately 1:40 a.m. on the night of Bonham's murder, Campos saw that
appellant's shirt was ripped open and that he had a cut lip; (12) the night of Bonham's
murder, appellant left the nightclub with his niece, who saw that he had a cut to his face
and a bleeding stab wound to his abdomen; (13) the day after Bonham's murder, Chapa
saw scratches on appellant's face; (14) when police officers came to the job site, appellant
had disappeared from the job site; (15) Johnny Villareal identified appellant, John Phillip,
and Joe Quin Villareal as being involved in Bonham's murder; (16) forensics revealed that
appellant's blood was on Bonham's jeans; and (17) after the fight, appellant burned his
clothes.

 Appellant provided controverting evidence showing that: (1) he cut his face on
barbed wire; (2) when Bonham entered the bar, he hoped HPL members did not see
Bonham; (3) after Johnny Villareal gave a gun to John Phillip, appellant took the gun from
John Phillip and gave it back to Johnny; (4) appellant was at the fight in order to break it
up and to get John Phillip away from it; (5) during the fight, appellant was stabbed,
explaining his blood on Bonham's jeans; (6) appellant was stabbed by Johnny Villareal
because he refused to participate in Bonham's murder; and (7) appellant saw Johnny
Villareal stab Bonham, and he saw Joe Quin Villareal shoot him twice. 

 The jury was entitled to disbelieve appellant's testimony that he tried to break up the
fight and to keep John Phillip away from it. See Margraves, 34 S.W.3d at 919; see also
Roy v. State, 997 S.W.2d 863, 868 (Tex. App.-Fort Worth 1999, pet. ref'd). Viewing the
evidence in the light most favorable to the verdict, we conclude the evidence is legally
sufficient for a rational jury to find appellant guilty as a party to Bonham's murder beyond
a reasonable doubt. We also conclude that the evidence supporting the conviction is not
so weak that the fact-finder's determination is clearly wrong and manifestly unjust, or that
the verdict is against the great weight and preponderance of the evidence.

2. Engaging in Organized Criminal Activity

 The court charged the jury that they could convict appellant of engaging in organized
criminal activity if he committed murder as a member of a criminal-street gang. A person
commits the offense of engaging in organized criminal activity if, "with the intent to
establish, maintain, or participate . . . as a member of a criminal street gang," he commits
or conspires to commit one or more specified offenses, here, murder. Tex. Penal Code
Ann. § 71.02(a)(1) (Vernon Supp. 2007). The Texas Penal Code defines "criminal street
gang" as "three or more persons having a common identifying sign or symbol or an
identifiable leadership who continuously or regularly associate in the commission of
criminal activities." Id. § 71.01(d) (Vernon 2003). Under the plain language of section
71.02(a), a defendant is guilty of engaging in organized criminal activity when the State
proves the first element-that the defendant committed a specific offense that is listed
under that chapter, such as murder-and the second element, that the defendant
committed that offense "with the intent to establish, maintain, or participate . . . as a
member of a criminal street gang." Id. § 71.02(a). (4)

 Here, the evidence showed HPL is a prison-and-street gang involved in narcotics
sales as well as transporting firearms and illegal immigrants. Johnny Villareal was its local
boss. Thus, HPL meets the definition of a criminal-street gang. See Tex. Penal Code
Ann. § 71.01(d) (Vernon 2003). The evidence also showed that appellant, with the intent
to participate as an HPL member, committed the specified offense of murder. See Tex.
Penal Code Ann. § 71.02(a)(1) (Vernon Supp. 2007).

 Viewing the evidence in the light most favorable to the verdict, we conclude that a
rational trier of fact could have determined beyond a reasonable doubt that appellant
committed the underlying murder with the intent to participate as a member of the criminal-street gang, HPL. See Tex. Penal Code Ann. § 71.02(a) (Vernon Supp. 2007). We also
conclude that the evidence supporting the conviction is not so weak that the fact-finder's
determination is clearly wrong and manifestly unjust or the verdict is against the great
weight and preponderance of the evidence. Issue one is overruled.

C. Failure to Declare Mistrial

 By issue two, appellant asserts the trial court erred in failing to sua sponte grant a
mistrial because of the "poor acoustical conditions" of the courtroom in which his case was
tried. A trial court has discretion to declare a mistrial sua sponte when "in [its] opinion,
taking all the circumstances into consideration, there is a manifest necessity for the act,
or the ends of public justice would otherwise be defeated." Torres v. State, 614 S.W.2d
436, 442 (Tex. Crim. App. 1981). The power to grant a mistrial sua sponte should be used
with "the greatest caution, under urgent circumstances, and for very plain and obvious
causes." Id.; Parrish v. State, 38 S.W.3d 831, 834 (Tex. App.-Houston [14th Dist.] 2001,
no pet.) (citing Ex parte Little, 887 S.W.2d 62, 64 (Tex. Crim. App. 1994) (concluding trial
judge's discretion to declare mistrial based on manifest necessity limited to "very
extraordinary and striking circumstances")). There must be a "high degree" of necessity
that the trial come to an end. Torres, 614 S.W.2d at 442.

 A review of the record shows that on several occasions, a witness was asked to
speak louder. However, there is no indication that any objection was made to any
acoustical conditions in the courtroom. Having reviewed the trial record, we conclude the
circumstances presented here do not create the type of "urgent circumstances" required
for the trial judge to have granted a sua sponte mistrial. See id. Because the complained-of courtroom acoustics did not create a "manifest necessity" for granting a mistrial or
otherwise defeat the "ends of public justice," we conclude the trial court did not abuse its
discretion in failing to sua sponte grant a mistrial. See Torres, 614 S.W.2d at 442. Issue
two is overruled.

D. Punishment

 By issue three, appellant argues that the punishment assessed was disproportionate
to the seriousness of the offenses, in violation of the Eighth and Fourteenth Amendments
of the United States Constitution. See U.S. Const. amends. VIII and XIV. The Eighth
Amendment provides "Excessive bail shall not be required, nor excessive fines imposed,
nor cruel and unusual punishment inflicted." U.S. Const. amend. VIII.

 Appellant did not object to the sentence at trial. Additionally, he did not file any
post-trial motions or objections complaining that his sentence was either disproportionate
to the seriousness of the offense, or complaining about the disparity, cruelty, unusualness
or excessiveness of the sentence. 

 To preserve error for appellate review, a party must present a timely objection to the
trial court, state the specific grounds for the objection, and obtain a ruling. Tex. R. App. P.
33.1(a); Dixon v. State, 2 S.W.3d 263, 265 (Tex. Crim. App. 1998). The failure to
specifically object to an alleged disproportionate sentence in the trial court or in a post-trial
motion waives any error for our review. Jacoby v. State, 227 S.W.3d 128, 130 (Tex.
App.-Houston [1st Dist.] 2006, pet. ref'd); see, e.g., Nicholas v. State, 56 S.W.3d 760, 768
(Tex. App.-Houston [14th Dist.] 2001, pet. ref'd) (failure to complain to trial court about
consecutive sentencing waived error); Solis v. State, 945 S.W.2d 300, 301 (Tex.
App.-Houston [1st Dist.] 1997, pet. ref'd) (holding that a claim of a grossly disproportionate
sentence violative of Eighth Amendment was forfeited by failure to object). Here, appellant
neither objected to the alleged disproportionality of the sentence in the trial court, nor
raised the issue in a post-trial motion; he is raising it for the first time on appeal. His
argument, therefore, is not preserved for review. See Tex. R. App. P. 33.1(a); Jacoby, 227
S.W.3d at 130.

 Even assuming appellant preserved the complaint, we conclude that his life
sentences were within the statutorily prescribed punishment range. The maximum
punishment range for a first-degree felony is life imprisonment. Tex. Penal Code Ann. §
12.33(a), (b) (Vernon 2003). Punishment assessed within the statutory limits is generally
not cruel and unusual punishment. Harris v. State, 656 S.W.2d 481, 486 (Tex. Crim. App.
1983) (holding that punishment which falls within the limits prescribed by a valid statute is
not excessive, cruel or unusual); Samuel v. State, 477 S.W.2d 611, 614 (Tex. Crim. App.
1972); Swinney v. State, 828 S.W.2d 254, 259 (Tex. App.-Houston [1st Dist.] 1992, no
pet.).

 Appellant asks this Court to apply the Solem proportionate analysis test to his
sentence. See Solem v. Helm, 463 U.S. 277, 291 (1983). This Court has recognized that
"the viability and mode of application of proportionate analysis . . . has been questioned
since the Supreme Court's decision in Harmelin v. Michigan, 501 U.S. 957 (1991)." 
Trevino v. State, 174 S.W.3d 925, 928 (Tex. App.-Corpus Christi 2005, pet. ref'd) (citing
McGruder v. Puckett, 954 F.2d 313, 315-16 (5th Cir.1992) (discussing the various opinions
issued in Harmelin, 501 U.S. at 957, and their impact on the Solem decision)); see Sullivan
v. State, 975 S.W.2d 755, 757-58 (Tex. App.-Corpus Christi 1998, no pet.) (discussing the
implications of the Harmelin opinion and reviewing the proportionality of appellant's
sentence under the Solem and McGruder tests). Assuming, arguendo, the viability of a
proportionality review, as we did in Sullivan, we will apply both the Solem and McGruder
tests to the facts of this case. (5) See Sullivan, 975 S.W.2d at 757-58. In both Solem and
McGruder, we look first at the gravity of the offense and the harshness of the penalty. 
Solem, 463 U.S. at 290; McGruder, 954 F.2d at 316.

1. Gravity of the Offense

 The evidence showed that appellant participated as an HPL member in Bonham's
murder. He acted as an "enforcer" of HPL's "green light" rule. Bonham was murdered
because he renounced his HPL membership.

2. Harshness of the Penalty

 Appellant was found guilty of murder and engaging in organized criminal activity. 
He was indicted as an habitual-felony offender. Based upon his instant convictions, his
criminal history, and the punishment range available, we conclude that appellant's life
sentences are not grossly disproportionate to his crimes. This finding ends our analysis
under McGruder. See McGruder, 954 F.2d at 316; see also Sullivan, 975 S.W.2d at 757. 
Because there is no evidence in the appellate record of the sentences imposed for other
crimes in Texas or for the same crime in other jurisdictions, we may not perform a
comparative evaluation using the remaining Solem factors. See Solem, 463 U.S. at 292;
see also Sullivan, 975 S.W.2d at 757-58. Therefore, we conclude that appellant's
sentence is neither grossly disproportionate nor cruel and unusual. Issue three is
overruled.

 The trial court's judgment is affirmed.

 

 ROSE VELA

 Justice

Do not publish. 

Tex. R. App. P. 47.2(b).

Memorandum Opinion delivered and 

filed this 24th day of April, 2008.
1. See Tex. Penal Code Ann. § 19.02 (Vernon 2003).
2. See Tex. Penal Code Ann. § 71.02 (Vernon Supp. 2007).
3. In this case, the indictment alleged, in relevant part, that appellant "did then and there, intentionally
or knowingly cause the death of Donald Wesley Bonham by shooting and stabbing said Donald Wesley
Bonham with a knife and a firearm . . . ."
4. See Curiel v. State, No. 01-05-00724-CR, 2007 WL 1119887, at *3 (Tex. App.-Houston [1st Dist.]
Apr. 12, 2007 pet. ref'd) (mem. op.) (not designated for publication).
5. McGiffin v. State, No. 13-05-561-CR, 2006 WL 2294553 (Tex.App.-Corpus Christi August 10, 2006,
no pet.) (mem. op.) (not designated for publication).