

NUMBER 13-07-0049-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

RUBEN ALEMAN A/K/A "MADDY"                                          Appellant,

v.

THE STATE OF TEXAS,                                                Appellee.

### On appeal from the 156th District Court
### of Bee County, Texas

## MEMORANDUM OPINION

### Before Justices Yañez, Rodriguez, and Vela
### Memorandum Opinion by Justice Vela

A jury convicted appellant, Ruben "Maddy" Aleman, of murder[1] and engaging in

organized criminal activity,[2] and assessed punishment at life imprisonment on both counts.

---

[1]*See* TEX. PENAL CODE ANN. § 19.02 (Vernon 2003).

[2]*See* TEX. PENAL CODE ANN. § 71.02 (Vernon Supp. 2007).

By three issues, appellant complains 1) the evidence is legally and factually insufficient to support the verdict, 2) the trial court erred in failing to *sua sponte* grant a mistrial, and 3) the punishment was disproportionate to the seriousness of the offense. We affirm.

## A. Background

*1. Facts Surrounding the Murder*

On April 17, 2005, Rebecca Rodriguez, Raymond Lemon, John Phillip Aleman (John Phillip), Anna Farias, and appellant attended a dance at a Beeville nightclub called the "Chick-A-Saw." Appellant was an "Hermandad de Pistoleros Latinos" (HPL) gang member, and his nephew, John Phillip, was a "prospecto" of HPL, a prospective member who had not yet earned his HPL membership. Two other HPL members, Johnny Villareal and Joe Quin Villareal, were also present at the nightclub.

That evening, Donald Bonham, also an HPL member, entered the Chick-A-Saw's bar without acknowledging his fellow HPL members. Bonham, who had recently been released from prison, had renounced his HPL membership. Pursuant to HPL rules, a renouncement meant Bonham had a "green light," which the gang defined as "marked for death" by other HPL members.

About midnight, Pedro Pena saw a man with an open knife in his hand leave the Chick-A-Saw bar. Outside the bar, he saw the man with the knife, along with two or three other men, fighting with Bonham. Bonham appeared to be trying to retreat from the men and "fight them off." Pena saw Bonham trip over a curb, and then he saw that Bonham had been shot. Appellant, John Phillip, Johnny Villareal, Joe Quin Villareal, and Bonham were later identified as participants in the fight, which resulted in Bonham's death.

That night, Carrie Campos was babysitting at Lemon's apartment. About 1:40 a.m., appellant, Rodriguez, Lemon, John Phillip, and Farias "rushed" into the apartment. They

appeared "scared" or "nervous." Even though someone turned off the lights, Campos, aided by the light from the TV, saw a rag wrapped around appellant's hand. His shirt was ripped open, and he had a cut lip. Frightened by what she saw, Campos told Rodriguez she wanted to go home. While Campos and Rodriguez were outside the apartment, Lemon came out, locked the door behind him, and told Rodriguez they needed to hide the cars. Campos left in her car, and Lemon and Rodriguez left quickly in separate cars.

On Monday, April 18, 2005, Rodrigo Chapa picked up appellant and drove to their work site. When they stopped for breakfast, he saw scratches on appellant's face. Appellant laughed when Chapa teased him about being in a "cat fight" with his girlfriend. That morning, two police officers came by looking for appellant, but appellant had disappeared from the job site. After work, as Chapa was driving off the job site, he saw appellant approaching his vehicle, yelling at him to stop. Chapa asked him what was going on, and he replied that he had "problems."

Rebecca Rodriguez, appellant's niece, testified that on the night of the murder, she and Raymond Lemon were at the Chick-A-Saw Bar. On the way there, they picked up appellant, John Phillip, and Anna Farias. During the dance, Farias pointed to Bonham, who stood at the bar wearing a white hat. As they left the bar, Rodriguez saw Johnny Villareal and Joe Quin Villareal running across the street toward Bonham. Rodriguez, Lemon, and Farias got into the car. Appellant and John Phillip then got into the car, and they went to Lemon's apartment. There, Rodriguez saw a cut on appellant's face. She also saw a stab wound on the side of his abdomen.

## 2. The Investigation and Autopsy

Officer Jason Alvarez gathered evidence from the crime scene. He found two knives, a cell phone, blood, a white cowboy hat, and two brass casings from a .22

3

Remington gun. During the search of Joe Quin Villareal's car, officers found a .22 gun in the glove compartment. In the trunk, they found a silver-plated .380 pistol, numerous boxes of ammunition, a stolen Benelli shotgun, large amounts of marihuana, a digital scale, and a white envelope containing HPL's constitution.

A forensic firearm and tool marks examination confirmed that the gun that was found in the glove compartment of Joe Quin Villareal's car was the weapon that killed Bonham. A forensic serology examination confirmed that DNA blood tests on materials and clothing found at the scene positively identified appellant's blood on the front of Bonham's jeans.

Bonham's autopsy showed he had fourteen sharp-force injuries caused by a sharp-edged weapon, two gunshot wounds, and abrasions. Several wounds on his left forearm were defensive, and his thigh had an abrasion as if hit by an object. He had a cut on the side of his face and earlobe. Death was caused by multiple, close-range gun-shot wounds in combination with sharp-force injuries caused by a knife.

*3. Details on HPL*

Officer Reagan Scott testified that HPL is a prison-and-street gang that is primarily involved in narcotics sales and transporting firearms and illegal immigrants. He stated that Johnny Villareal, the gang's local boss, agreed to act as a confidential informant and give information about gang activities. The morning after Bonham's murder, Scott and Villareal had a meeting, at which time Villareal identified appellant, John Phillip, and Joe Quin Villareal as those involved in the murder. Johnny Villareal told Scott that John Phillip was not actually a gang member; rather, he was a "prospecto." To earn gang membership, a

4

prospecto must do a "good act" or "honorable act," which means some type of aggravated assault.

Clemente Rodriguez, a TDCJ security threat group coordinator, testified he was familiar with prison gangs, including HPL. He confirmed that Bonham was an HPL member and that while in prison, he tried to leave HPL by signing a "renouncement" form. Rodriguez stated that if an HPL member refused to participate in the gang, he is marked to be killed. If an HPL member gets out of jail and does not report to HPL immediately, he is considered "AWOL per HPL regulations," and the "only way out is death." He also testified that a "green light" means that an individual is marked for death and that if a person has a "green light" and does not talk to other HPL members, as Bonham failed to do, it is perceived as shunning and disrespecting the other members which Rodriguez said "is a very dangerous thing to do." He further testified that appellant had been an HPL member since 1990. Rodriguez stated that if John Phillip was involved in the murder, he would automatically be validated and would become an HPL member.

*4. Appellant's Voluntary Statements and Testimony*

Appellant gave two voluntary statements. In one statement, he acknowledged a cut on his face, but did not admit that he was involved in a fight. He claimed to have cut his face on barbed wire. In the other statement, he stated that while at the dance, Johnny Villareal approached his table and said, "[W]e have to take care of business." Appellant told him to "hold up, man, I ain't going to do nothing I ain't supposed to do." Appellant went outside, saw the fight, and ran to the fight in order to grab John Phillip. He stated that John Phillip was trying to break the fight up, too. He told John Phillip to "get out of there." During the fight, appellant was stabbed, thus explaining how his blood got onto Bonham's

5

jeans. He did not know who stabbed him, but stated that he fell on top of Bonham when he was stabbed. When he was getting up, he saw Johnny stabbing Bonham. He then saw Joe Quin Villareal shoot Bonham twice. Appellant stated that he said, "hey, man, that's enough, man." Afterwards, appellant ran to Rebecca Rodriguez's car, went to her house, and cleaned up. He burned his clothes at his mother's house. He stated that Johnny ordered the hit "cause something to do with that dude, Donald, something in prison, something happened in prison. And it came out that they wanted him out of the way." Appellant stated that John Phillip was not an HPL member.

At the guilt/innocence phase, appellant testified he knew Bonham had a "green light," but did not know he was going to show up at the Chick-A-Saw Bar. When he saw Bonham enter the bar, he hoped HPL members did not see Bonham. At some point during the night, appellant saw everyone going into the restroom. He followed them inside and heard them discussing "who was going to do what." When Johnny Villareal gave John Phillip a gun, appellant said no, took the gun from John Phillip, and gave it back to Johnny. Appellant left the restroom and later saw people fighting outside. He went to the fight to see if John Phillip was involved. As he approached, he saw Johnny Villareal, John Phillip, and Joe Quin Villareal fighting with Bonham. Appellant told John Phillip to "get back in the car," but John Phillip ignored him. Appellant saw Joe Quin Villareal shoot Bonham, who had a knife. While appellant was trying to get John Phillip out of the way, appellant tripped and was stabbed by Johnny Villareal because appellant refused to participate in Bonham's murder. Appellant and Bonham fell on each other. Afterwards, appellant ran from the scene.

6

Appellant stated he joined HPL in 1987 and that he had convictions for aggravated assault, burglary of a building, and burglary of a habitation. He also stated that once a person is in HPL, the only way out is to be killed. He said that contrary to John Phillip's desires, he did not want him to join HPL.

## B. Sufficiency of the Evidence

By his first issue, appellant challenges the legal and factual sufficiency of the evidence to support the verdict. In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hampton v. State*, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319. The trier of fact is the sole judge of the weight and credibility of the evidence. TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Thus, when performing a legal-sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). We must resolve any inconsistencies in the evidence in favor of the judgment. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

When reviewing the factual sufficiency of the evidence, we view all the evidence in a neutral light, favoring neither party. *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); *Drichas v. State*, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005). We will set

7

aside the verdict only if:  (1) the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder's determination is clearly wrong and manifestly unjust; or (2) the verdict is against the great weight and preponderance of the evidence.  *Watson*, 204 S.W.3d at 414-15, 417; *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  We cannot conclude a conviction is "clearly wrong" or "manifestly unjust" simply because we would have voted to acquit.  *Watson*, 204 S.W.3d at 417.  In other words, we may not simply substitute our judgment for the fact-finder's judgment. *Johnson*, 23 S.W.3d at 12; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).

To reverse for factual sufficiency, we must determine, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the verdict.  *Watson*, 204 S.W.3d at 417.  In examining a factual sufficiency challenge, we defer to the fact-finder's determination of the credibility of the evidence.  *Swearingen v. State*, 101 S.W.3d 89, 97 (Tex. Crim. App. 2003).

*1. Murder*

A person commits murder if he or she intentionally or knowingly causes the death of an individual.  TEX. PENAL CODE ANN. § 19.02(a) (Vernon 2003).[3]  Intent can be inferred from the defendant's acts, words, and conduct.  *Patrick v. State,* 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); *Lee v. State,* 964 S.W.2d 3, 8 (Tex. App.–Houston [1st Dist.] 1997, pet. ref'd).

Here, the jury charge included an instruction on the law of parties. A person is "criminally responsible as a party to an offense if the offense is committed by his own

---

[3]In this case, the indictment alleged, in relevant part, that appellant "did then and there, intentionally or knowingly cause the death of Donald Wesley Bonham by shooting and stabbing said Donald Wesley Bonham with a knife and a firearm . . . ."

8

conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01(a) (Vernon 2003). A person is criminally responsible for an offense committed by another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2). "Each party to an offense may be charged with commission of the offense." *Id.* § 7.01(b).

While the presence of an accused at the scene of an offense is not alone sufficient to support a conviction, it is a circumstance tending to prove guilt, which, combined with other facts, may suffice to show that the accused was a participant. *Beardsley v. State*, 738 S.W.2d 681, 685 (Tex. Crim. App. 1987). Further, participation in an enterprise may be inferred from circumstances and need not be shown by direct evidence. *Id.* at 684.

In this case, a rational jury could have determined the following from the evidence: (1) appellant was a long-time HPL member; (2) the only way out of HPL was to be killed; (3) Bonham, by renouncing his HPL membership, had a "green light," which meant he was marked for death by other HPL members; (4) Bonham showed up at the bar without acknowledging his fellow HPL members; (5) appellant saw Bonham at the bar and knew Bonham had a "green light;" (6) Johnny Villareal and Joe Quin Villareal were HPL members; (7) they and appellant were at the nightclub the night of Bonham's murder; (8) on the night of the murder, Pena saw Bonham fighting with three or four other men outside the club; (9) Pena testified Bonham appeared to be trying to both retreat from the men and "fight them off;" (10) appellant, John Phillip, Johnny Villareal, Joe Quin Villareal, and Bonham were later identified as participants in the fight which resulted in Bonham's death; (11) at approximately 1:40 a.m. on the night of Bonham's murder, Campos saw that

9

appellant's shirt was ripped open and that he had a cut lip; (12) the night of Bonham's murder, appellant left the nightclub with his niece, who saw that he had a cut to his face and a bleeding stab wound to his abdomen; (13) the day after Bonham's murder, Chapa saw scratches on appellant's face; (14) when police officers came to the job site, appellant had disappeared from the job site; (15) Johnny Villareal identified appellant, John Phillip, and Joe Quin Villareal as being involved in Bonham's murder; (16) forensics revealed that appellant's blood was on Bonham's jeans; and (17) after the fight, appellant burned his clothes.

Appellant provided controverting evidence showing that: (1) he cut his face on barbed wire; (2) when Bonham entered the bar, he hoped HPL members did not see Bonham; (3) after Johnny Villareal gave a gun to John Phillip, appellant took the gun from John Phillip and gave it back to Johnny; (4) appellant was at the fight in order to break it up and to get John Phillip away from it; (5) during the fight, appellant was stabbed, explaining his blood on Bonham's jeans; (6) appellant was stabbed by Johnny Villareal because he refused to participate in Bonham's murder; and (7) appellant saw Johnny Villareal stab Bonham, and he saw Joe Quin Villareal shoot him twice.

The jury was entitled to disbelieve appellant's testimony that he tried to break up the fight and to keep John Phillip away from it. *See Margraves,* 34 S.W.3d at 919; *see also Roy v. State,* 997 S.W.2d 863, 868 (Tex. App.–Fort Worth 1999, pet. ref'd). Viewing the evidence in the light most favorable to the verdict, we conclude the evidence is legally sufficient for a rational jury to find appellant guilty as a party to Bonham's murder beyond a reasonable doubt. We also conclude that the evidence supporting the conviction is not

so weak that the fact-finder's determination is clearly wrong and manifestly unjust, or that the verdict is against the great weight and preponderance of the evidence.

*2. Engaging in Organized Criminal Activity*

The court charged the jury that they could convict appellant of engaging in organized criminal activity if he committed murder as a member of a criminal-street gang. A person commits the offense of engaging in organized criminal activity if, "with the intent to establish, maintain, or participate . . . as a member of a criminal street gang," he commits or conspires to commit one or more specified offenses, here, murder. TEX. PENAL CODE ANN. § 71.02(a)(1) (Vernon Supp. 2007). The Texas Penal Code defines "criminal street gang" as "three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities." *Id.* § 71.01(d) (Vernon 2003). Under the plain language of section 71.02(a), a defendant is guilty of engaging in organized criminal activity when the State proves the first element–that the defendant committed a specific offense that is listed under that chapter, such as murder–and the second element, that the defendant committed that offense "with the intent to establish, maintain, or participate . . . as a member of a criminal street gang." *Id.* § 71.02(a).[4]

Here, the evidence showed HPL is a prison-and-street gang involved in narcotics sales as well as transporting firearms and illegal immigrants. Johnny Villareal was its local boss. Thus, HPL meets the definition of a criminal-street gang. *See* TEX. PENAL CODE ANN. § 71.01(d) (Vernon 2003). The evidence also showed that appellant, with the intent

---

[4]*See Curiel v. State,* No. 01-05-00724-CR, 2007 WL 1119887, at *3 (Tex. App.–Houston [1st Dist.] Apr. 12, 2007 pet. ref'd) (mem. op.) (not designated for publication).

11

to participate as an HPL member, committed the specified offense of murder. *See* TEX. PENAL CODE ANN. § 71.02(a)(1) (Vernon Supp. 2007).

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have determined beyond a reasonable doubt that appellant committed the underlying murder with the intent to participate as a member of the criminal-street gang, HPL. *See* TEX. PENAL CODE ANN. § 71.02(a) (Vernon Supp. 2007). We also conclude that the evidence supporting the conviction is not so weak that the fact-finder's determination is clearly wrong and manifestly unjust or the verdict is against the great weight and preponderance of the evidence. Issue one is overruled.

### C. Failure to Declare Mistrial

By issue two, appellant asserts the trial court erred in failing to *sua sponte* grant a mistrial because of the "poor acoustical conditions" of the courtroom in which his case was tried. A trial court has discretion to declare a mistrial *sua sponte* when "in [its] opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." *Torres v. State*, 614 S.W.2d 436, 442 (Tex. Crim. App. 1981). The power to grant a mistrial *sua sponte* should be used with "the greatest caution, under urgent circumstances, and for very plain and obvious causes." *Id.*; *Parrish v. State*, 38 S.W.3d 831, 834 (Tex. App.–Houston [14th Dist.] 2001, no pet.) (citing *Ex parte Little,* 887 S.W.2d 62, 64 (Tex. Crim. App. 1994) (concluding trial judge's discretion to declare mistrial based on manifest necessity limited to "very extraordinary and striking circumstances")). There must be a "high degree" of necessity that the trial come to an end. *Torres,* 614 S.W.2d at 442.

12

A review of the record shows that on several occasions, a witness was asked to speak louder. However, there is no indication that any objection was made to any acoustical conditions in the courtroom. Having reviewed the trial record, we conclude the circumstances presented here do not create the type of "urgent circumstances" required for the trial judge to have granted a *sua sponte* mistrial. *See id.* Because the complained-of courtroom acoustics did not create a "manifest necessity" for granting a mistrial or otherwise defeat the "ends of public justice," we conclude the trial court did not abuse its discretion in failing to *sua sponte* grant a mistrial. *See Torres*, 614 S.W.2d at 442. Issue two is overruled.

## D. Punishment

By issue three, appellant argues that the punishment assessed was disproportionate to the seriousness of the offenses, in violation of the Eighth and Fourteenth Amendments of the United States Constitution. *See* U.S. CONST. amends. VIII and XIV. The Eighth Amendment provides "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." U.S. CONST. amend. VIII.

Appellant did not object to the sentence at trial. Additionally, he did not file any post-trial motions or objections complaining that his sentence was either disproportionate to the seriousness of the offense, or complaining about the disparity, cruelty, unusualness or excessiveness of the sentence.

To preserve error for appellate review, a party must present a timely objection to the trial court, state the specific grounds for the objection, and obtain a ruling. TEX. R. APP. P. 33.1(a); *Dixon v. State*, 2 S.W.3d 263, 265 (Tex. Crim. App. 1998). The failure to specifically object to an alleged disproportionate sentence in the trial court or in a post-trial

13

motion waives any error for our review. *Jacoby v. State*, 227 S.W.3d 128, 130 (Tex. App.–Houston [1st Dist.] 2006, pet. ref'd); *see, e.g., Nicholas v. State*, 56 S.W.3d 760, 768 (Tex. App.–Houston [14th Dist.] 2001, pet. ref'd) (failure to complain to trial court about consecutive sentencing waived error); *Solis v. State*, 945 S.W.2d 300, 301 (Tex. App.–Houston [1st Dist.] 1997, pet. ref'd) (holding that a claim of a grossly disproportionate sentence violative of Eighth Amendment was forfeited by failure to object). Here, appellant neither objected to the alleged disproportionality of the sentence in the trial court, nor raised the issue in a post-trial motion; he is raising it for the first time on appeal. His argument, therefore, is not preserved for review. *See* TEX. R. APP. P. 33.1(a); *Jacoby*, 227 S.W.3d at 130.

Even assuming appellant preserved the complaint, we conclude that his life sentences were within the statutorily prescribed punishment range. The maximum punishment range for a first-degree felony is life imprisonment. TEX. PENAL CODE ANN. § 12.33(a), (b) (Vernon 2003). Punishment assessed within the statutory limits is generally not cruel and unusual punishment. *Harris v. State*, 656 S.W.2d 481, 486 (Tex. Crim. App. 1983) (holding that punishment which falls within the limits prescribed by a valid statute is not excessive, cruel or unusual); *Samuel v. State,* 477 S.W.2d 611, 614 (Tex. Crim. App. 1972); *Swinney v. State,* 828 S.W.2d 254, 259 (Tex. App.–Houston [1st Dist.] 1992, no pet.).

Appellant asks this Court to apply the *Solem* proportionate analysis test to his sentence. *See Solem v. Helm,* 463 U.S. 277, 291 (1983). This Court has recognized that "the viability and mode of application of proportionate analysis . . . has been questioned since the Supreme Court's decision in *Harmelin v. Michigan,* 501 U.S. 957 (1991)."

14

*Trevino v. State,* 174 S.W.3d 925, 928 (Tex. App.–Corpus Christi 2005, pet. ref'd) (citing

*McGruder v. Puckett,* 954 F.2d 313, 315-16 (5th Cir.1992) (discussing the various opinions

issued in *Harmelin,* 501 U.S. at 957, and their impact on the *Solem* decision)); *see Sullivan

v. State,* 975 S.W.2d 755, 757-58 (Tex. App.–Corpus Christi 1998, no pet.) (discussing the

implications of the *Harmelin* opinion and reviewing the proportionality of appellant's

sentence under the *Solem* and *McGruder* tests).  Assuming, *arguendo,* the viability of a

proportionality review, as we did in *Sullivan,* we will apply both the *Solem* and *McGruder*

tests to the facts of this case.[5]  *See Sullivan*, 975 S.W.2d at 757-58.  In both *Solem* and

*McGruder,* we look first at the gravity of the offense and the harshness of the penalty.

*Solem,* 463 U.S. at 290; *McGruder,* 954 F.2d at 316.

*1. Gravity of the Offense*

The evidence showed that appellant participated as an HPL member in Bonham's

murder.  He acted as an "enforcer" of HPL's "green light" rule.  Bonham was murdered

because he renounced his HPL membership.

*2. Harshness of the Penalty*

Appellant was found guilty of murder and engaging in organized criminal activity.

He was indicted as an habitual-felony offender.  Based upon his instant convictions, his

criminal history, and the punishment range available, we conclude that appellant's life

sentences are not grossly disproportionate to his crimes.  This finding ends our analysis

under *McGruder.  See McGruder,* 954 F.2d at 316; *see also Sullivan,* 975 S.W.2d at 757.

Because there is no evidence in the appellate record of the sentences imposed for other

---

[5]*McGiffin v. State,* No. 13-05-561-CR, 2006 WL 2294553 (Tex.App.–Corpus Christi August 10, 2006, no pet.) (mem. op.) (not designated for publication).

crimes in Texas or for the same crime in other jurisdictions, we may not perform a comparative evaluation using the remaining *Solem* factors. *See Solem,* 463 U.S. at 292; *see also Sullivan,* 975 S.W.2d at 757-58. Therefore, we conclude that appellant's sentence is neither grossly disproportionate nor cruel and unusual. Issue three is overruled.

The trial court's judgment is affirmed.

_____

_____  ROSE VELA
_____  Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Memorandum Opinion delivered and
filed this 24th day of April, 2008.