

## NUMBER 13-09-121-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

JESUS GONZALEZ, JR.,                                                                 Appellant,

v.

THE STATE OF TEXAS,                                                                 Appellee.

### On appeal from the 197th District Court
### of Cameron County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Benavides and Vela**
**Memorandum Opinion by Justice Vela**

A jury convicted appellant, Jesus Gonzalez, Jr., of engaging in organized criminal activity, a first-degree felony. *See* TEX. PENAL CODE ANN. § 71.02(a)(1), (b) (Vernon Supp. 2009). After a punishment hearing, the jury assessed punishment at life imprisonment,

plus a $10,000 fine. *See id.* § 12.32(a),[1] (b).[2]  In two issues, appellant challenges the legal and factual sufficiency of the evidence supporting his conviction.  We affirm.

## I. FACTUAL BACKGROUND

This case involves the murder of Jo Ann Chavez, who associated with members of a gang called the "Mexican Mafia."  On August 18, 2005, authorities exhumed her skeletal remains[3] buried in a shallow grave on the outskirts of Raymondville, Texas.  About 11:00 a.m. on November 17, 2003, Chavez called a friend, Norma Cano, stating that she and "Polo" were in Raymondville.  After that conversation, Cano and Chavez spoke by telephone "off and on" until about 5:00 p.m. that day.  At that time, Chavez told Cano she could not talk and hung up the phone.  About two days later, Chavez's common-law husband, Graciano Castaneda, reported Chavez as a missing person to the Harlingen Police Department.  Shortly thereafter, police recovered Chavez's car at Valle Vista Mall in Harlingen, Texas.

Ranger Victor Escalon, Jr., the lead investigator in this case, testified that Polo's name was Marcos Solis and obtained a statement from Solis's girlfriend, who stated that Solis told her he had seen Chavez on November 17, 2003.  However, when he spoke to Solis about Chavez's disappearance, Solis denied knowing anything.

A break in the case came on August 10, 2005, when Luis Carlos Mares, a Mexican Mafia sergeant, provided a statement to Ranger Escalon, stating that Willie Padilla, a

---

[1]Section 12.32(a) provides, "An individual adjudged guilty of a felony of the first degree shall be punished by imprisonment in the Texas Department of Criminal Justice for life or for any term of not more than 99 years or less than five years."  TEX. PENAL CODE ANN. § 12.32(a) (Vernon Supp. 2009).

[2]Section 12.32(b) provides, "In addition to imprisonment, an individual adjudged guilty of a felony of the first degree may be punished by a fine not to exceed $10,000."  *Id.* § 12.32(b).

[3]Chavez's remains were identified through mitochondrial DNA analysis conducted at the FBI's laboratory in Quantico, Virginia.

Mexican Mafia captain, "put the hit on Jo Ann Chavez." Padilla ordered her murder because: (1) he believed she was talking to the police about his drug deals; (2) she was having an affair with him; (3) she set up a drug deal with him and a rival gang member that violated Mexican Mafia rules; and (4) the rival gang member "was going to rip off" Padilla. Mares told Ranger Escalon that he and several other Mexican Mafia members committed the murder and that before she died, Solis tried to pistol whip her but missed and hit the car that Solis drove to the crime scene. Ranger Escalon found a "dent or impression" on Solis's car where Mares told him to look. Ranger Escalon opined that this "indentation" was consistent with the rear sights of a pistol striking the car. After Mares provided the statement to Ranger Escalon, Mares took him to Chavez's grave.

In April or May 2006, Mares gave a second statement in which he took "full responsibility" for Chavez's murder. Mares explained to Ranger Escalon that Oscar Salazar and Ricardo Reyes "pressured" him into making this second statement and that if he did not cooperate, "something" could happen to either him or his family.

Both Mares and a Mexican Mafia prospecto, Ricardo Davila, testified against appellant. Mares had been associated with the Mexican Mafia for nine years. He testified that the Mexican Mafia is a "criminal gang" that engages in racketeering, extortion, and murder. When the prosecutor asked him, "How do you begin in that organization?", he said that a person has to go through a "process," starting as "*Esquina*." Next, the person advances to "*Prospecto*" and then he becomes a "*Carnal*." The Mexican Mafia had a ranking structure, starting with president and then to vice-president, general, captain, lieutenant, sergeant, and "the original members." To advance in the Mexican Mafia, a person must perform "*Camellos*," which "are like hits, all kinds of extortion and all kinds of crimes." Mares achieved the rank of sergeant, which meant that if there was an

3

assignment, such as a murder, kidnapping, or drug trafficking, he had "to make sure it was organized and carried out."

At the time of Chavez's murder, the persons whom Mares knew as his associates in the Mexican Mafia were Willie Padilla, the captain of the Mexican Mafia from Houston down to the Rio Grande Valley, Esteban Salazar, a Mexican Mafia lieutenant, Ricardo Velasquez, Marcos Solis, Bernardo Cortez, Ricardo De La Rosa, May Trevino, Ricardo Davila, and appellant. Mares knew appellant to be a prospecto in the Mexican Mafia. He testified that this "group of men" were involved in some of the criminal activities engaged in by the Mexican Mafia. Mares said that appellant accompanied him on kidnapings, drug trafficking, and Chavez's murder.

At some point, Padilla told Mares, Salazar, and Velasquez that they had to kill Chavez. On November 17, 2003, Velasquez and De La Rosa told Mares that Solis and Chavez were in Raymondville. Mares drove to Salazar's home, where he met Salazar, Velasquez, De La Rosa, Cortez, and appellant. At this meeting, Mares, Velasquez, and Salazar discussed information about Chavez. Afterwards, Mares, Cortez, and appellant drove to Trevino's house in Raymondville and picked up Trevino and a shovel. They drove to a field outside of Raymondville, where Mares saw Solis and Chavez, standing in front of Solis's car. Chavez's legs were tied, and her wrists were tied behind her back. Solis pistol whipped her, and she fell to the ground. Solis strangled her while appellant "was on top of her legs, on her knees, holding her down."

Davila, a Mexican Mafia prospecto, testified that on November 17, 2003, between 10:00 p.m. and 11:30 p.m., he received a call from Trevino and Mares, asking him to bring "some shovels" to the crime scene. When he arrived, Cortez and appellant helped him dig a "hole" that would serve as Chavez's grave. Afterwards, Cortez, Solis, Mares, and

4

appellant drug her body to the hole. Appellant grabbed her feet and drug her into the hole.

In 2005, appellant and Carlos Arriola, an ex-Mexican Mafia member, were incarcerated in the same facility. When the prosecutor asked him if appellant told him anything about Chavez's murder, Arriola said:

> He told me . . . that one of his [appellant's] friends . . . picked her up at the Harlingen Mall. They were partying, they were drinking, and they took her where he was at. And after that, they took her to some place over there in Raymondville and buried her. They killed her. They hit her with a gun on her head and some bricks and killed her.
>
> * * * *
>
> And for him [appellant], in order to get up–to move up in the Mexican Mafia, it was like he was a puppy and he had to do that command. So that's what he did. So that's what he did to be in the Mexican Mafia.

When the prosecutor asked him why he was telling this to the jury, he said, "I'm doing it because that was not right, what he told me, and the way he put it, and the way he let me know that he killed her, they killed her with no remorse, . . . ."

Ranger Escalon testified his investigation revealed that appellant "confessed to" Arriola. During that confession, appellant "stated what occurred, that he was present, that he held her [Chavez] down, that she was buried, that they put bricks on top of her, it was raining that night, and the reason why she was killed." Ranger Escalon testified that these details were not made known to the public and that when authorities exhumed Chavez's body, they found bricks on top of her body.

Angelita Ontiveros, Chavez's sister and Padilla's ex-girlfriend, testified that prior to Chavez's disappearance, she, Solis, and Salazar were at Padilla's home. She overheard them say that Chavez "was nothing but a bitch and a slut" and that "she was fucking up." She also heard them say "[t]hat something had to be done." On cross-examination, she testified that in 2005 or 2006, Padilla wrote her a letter, stating that he had "an affair" with

5

Chavez.

Rosalva Luz Gallegos, appellant's ex-wife, testified that appellant was a Mexican Mafia member in November 2003. That month, appellant "put some clothes in a barbecue pit and began to burn the clothes." She described the clothes as "Dickies pants and tennis shoes." When the prosecutor asked her, "What were you thinking?", she said, "Just that he [appellant] must have done something wrong and he's trying to get rid of the evidence somehow."

Ranger Escalon testified that he interviewed Gallegos and "learned that around the time Jo Ann Chavez came up missing, the defendant was burning clothes. When he was burning the clothes, he made it look like he was having a barbecue."

Chavez's autopsy[4] report showed she had facial-bone fractures, a hyoid-bone fracture, and rib fractures. It listed the cause of death as "homicidal violence with blunt force trauma of the head, neck, and chest." Detective Rick Gonzalez attended the autopsy and testified that Dr. Marguerite DeWitt[5] "advised" him "that the cause of death was not only the blunt force trauma but she was also strangulated."

Dr. Norma Farley, a forensic pathologist, reviewed Chavez's autopsy report and testified that the injury to Chavez's face was consistent with being pistol whipped or being hit with a hard object, such as a handgun. She said that the hyoid bone is a U-shaped bone very high in a person's neck and that hyoid-bone fractures are consistent with strangulation.

Dionicio Cortez, the Cameron County Sheriff's Office gang investigator, testified that the Mexican Mafia is "known as an organization or a prison gang" with a written constitution

---

[4]The State introduced Chavez's autopsy report into evidence as State's exhibit 56.

[5]Dr. Marguarite DeWitt performed Chavez's autopsy but did not testify at the trial of this case.

and bylaws. When asked by the prosecutor what activities the gang dealt with, he said, the gang's constitution "talks about extortion, prostitution, drugs of high magnitude, or basically anything that they can imagine," including murder. He explained that after a person becomes a Mexican Mafia prospecto, the person has to show his loyalty by doing "camellos," or jobs, for the gang. Once a prospecto performs several camellos, his "name gets brought into the committee," which will vote on whether the prospecto should become a carnal. Upon becoming a carnal, the person "graduate[s] into the Carnalismo" and becomes a "Brother." From there, a person "can move up the ranks because they [the Mexican Mafia] do have a rank structure."

Cortez also testified that appellant's body had tattoos, which identified him as a Mexican Mafia member. He said the tattoo on appellant's stomach represented "Mexicano, of Mexican origin. The Mexican Mafia uses that a lot." The numbers "1" and "3" tattooed on his body represented 13. The thirteenth letter of the alphabet is "'M' for Mexicano for Mexican Mafia.'" The back of his head had a tattoo of an Aztec symbol, which showed homage to the god of war called Huitzilopochtli. Cortez said "[t]his is a very known tattoo with the Mexican Mafia that they use quite a bit." He said a person is only allowed to wear those tattoos "once you graduate into that organization." When asked by the prosecutor whether, in his opinion, appellant was "a member of the criminal street gang known as the Mexican Mafia," he said, "Yes, ma'am." On cross-examination, Cortez testified that he did not know if appellant had these tattoos in November 2003, or if appellant was a Mexican Mafia member at that time.

## II. SUFFICIENCY OF THE EVIDENCE

### A. Legal Sufficiency

In his first issue, appellant argues that the evidence is legally insufficient to establish

7

the elements of engaging in organized criminal activity beyond a reasonable doubt. Specifically, he contends that the evidence established that at the time of the murder, he was not a member of a criminal street gang. He further contends that the evidence failed to establish that he either committed or participated in the murder.

## 1. Applicable Law

"When conducting a legal sufficiency review, a court must ask whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'–not whether '*it* believes that the evidence at trial established guilt beyond a reasonable doubt.'" *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)) (emphasis in original). "In doing so, we assess all of the evidence 'in the light most favorable to the prosecution.'" *Id*. (quoting *Jackson*, 443 U.S. at 319). "After giving proper deference to the fact finder's role, we will uphold the verdict unless a rational fact finder must have had reasonable doubt as to any essential element." *Id*. at 518.

Our review of a legal and factual sufficiency challenge should be examined under the principles of review for a hypothetically correct jury charge. *Grotti v. State*, 273 S.W.3d 273, 280-81 (Tex. Crim. App. 2008). "'Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof, or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).

A person commits the offense of engaging in organized criminal activity "if, with the intent to establish, maintain, or participate . . . as a member of a criminal street gang, the

8

person commits or conspires to commit . . . murder." TEX. PENAL CODE ANN. § 71.02(a)-(a)(1). Section 71.01(d) defines a "criminal street gang" as "three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities." *Id*. § 71.01(d) (Vernon 2003). "Conspires to commit" means that:

> a person agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense and that person and one or more of them perform an overt act in pursuance of the agreement. An agreement constituting conspiring to commit may be inferred from the acts of the parties.

*Id*. § 71.01(b).

The underlying offense in this case was the murder of Chavez. A person commits murder if he or she "intentionally or knowingly causes the death of an individual." *Id*. § 19.02(b)(1). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id*. § 6.03(a). Intent can be inferred from the defendant's acts, words, and conduct. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); *Lee v. State*, 964 S.W.2d 3, 8 (Tex. App.–Houston [1st Dist.] 1997, pet. ref'd). Section 6.03(b) of the penal code provides:

> A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

TEX. PENAL CODE ANN. § 6.03(b) (Vernon 2003).

The charge included an instruction on the law of parties. A person is "criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *Id*. § 7.01(a). A

9

person is criminally responsible for an offense committed by another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2). "Each party to an offense may be charged with commission of the offense." *Id.* § 7.01(b).

While the presence of an accused at the scene of an offense is not sufficient by itself to support a conviction, "it is a circumstance tending to prove guilt, which, combined with other facts, may suffice to show that the accused was a participant." *Beardsley v. State*, 738 S.W.2d 681, 685 (Tex. Crim. App. 1987). Furthermore, "participation in an enterprise may be inferred from circumstances and need not be shown by direct evidence." *Id.* at 684.

**2. Analysis**

*a. Sufficiency of the Evidence to Support Appellant's Intent to Participate as a Member of a Criminal Street Gang*

Cortez testified that the Mexican Mafia had common identifying signs or symbols. Mares testified that the Mexican Mafia had an identifiable leadership, that Padilla served as the Mexican Mafia's captain for the Rio Grande Valley, and that the Mexican Mafia members in the Valley regularly associated in the commission of criminal activities such as drug trafficking, murder, kidnaping, and extortion. Appellant's ex-wife testified appellant was a Mexican Mafia member in November 2003. The evidence showed that the other persons who took part in Chavez's murder were either prospects or ranking officers in the Mexican Mafia. Thus, a rational jury could conclude that appellant was a member of a criminal street gang at the time of Chavez's murder. *See* TEX. PENAL CODE ANN. § 71.01(d) (defining "criminal street gang" as "three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the

10

commission of criminal activities").

*b. Sufficiency of the Evidence to Show Appellant Murdered Chavez*

A rational jury could have determined the following from the evidence that: (1) Padilla ordered Chavez's murder; (2) appellant held Chavez while Solis strangled her, and then appellant helped drag her body to the makeshift grave; (3) Chavez died from strangulation and blunt-force trauma to the face; (4) appellant told Arriola that he killed Chavez; (5) Arriola testified that by killing Chavez, appellant could move up in the gang; (6) around the time of Chavez's disappearance, appellant was seen burning clothes and shoes in a barbecue pit; and (7) after the murder, appellant and the others fled the crime scene.

*c. Sufficiency of the Evidence to Show Appellant Conspired to Murder Chavez*

The evidence also showed that on the evening of Chavez's murder, appellant and other Mexican Mafia members met at Salazar's house. Afterwards, appellant and Mares went to Trevino's house and picked up Trevino along with a shovel. Then, they went to the location where Chavez was murdered. The evidence demonstrated that appellant helped Solis murder Chavez and then assisted in dragging her body to the makeshift grave. A rational jury could infer from this evidence that appellant agreed with one or more of the Mexican Mafia members to engage in conduct that would constitute the offense and that one of these members performed an overt act in pursuance of the agreement. *See id*. § 71.01(b) (defining "conspires to commit" as a person agreeing with one or more persons that any one of them engage in conduct constituting the offense and one of them performing an overt act in pursuance of the agreement).

Viewing the evidence in the light most favorable to the verdict, we conclude the evidence is legally sufficient for a rational jury to find appellant guilty of engaging in

11

organized criminal activity beyond a reasonable doubt.  Issue one is overruled.

## B. Factual Sufficiency

In his second issue, appellant challenges the factual sufficiency of the evidence to support his conviction.  Specifically, he contends that the evidence fails to establish that he was a member of a criminal street gang or that he either committed or participated in the murder.

### 1. Applicable Law

In a factual-sufficiency review, the only question to be answered is:  "Considering all of the evidence in a neutral light, was a jury rationally justified in finding guilt beyond a reasonable doubt?"  *Grotti*, 273 S.W.3d at 283.  Evidence can be deemed factually insufficient in two ways:  (1) "the evidence supporting the conviction is 'too weak' to support the fact finder's verdict"; or (2) "considering conflicting evidence, the fact finder's verdict is 'against the great weight and preponderance of the evidence.'"  *Laster*, 275 S.W.3d at 518 (quoting *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006)).  When a court of appeals conducts a factual-sufficiency review, it must defer to the jury's findings.  *Id*.  The court of criminal appeals has "set out three 'basic ground rules' implementing this standard."  *Id*. (quoting *Watson*, 204 S.W.3d at 414).  First, the appellate court must consider all of the evidence in a neutral light, as opposed to in a light most favorable to the verdict.  *Id*.  Second, the appellate court "may only find the evidence factually insufficient when necessary to 'prevent manifest injustice.'"  *Id*.  (quoting *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997)).  Third, the appellate court must explain why the evidence is too weak to support the verdict or why the conflicting evidence greatly weighs against the verdict.  *Id*.  Although the verdict is afforded less deference during a factual-sufficiency review, an appellate court is not free to "override the verdict simply because it

disagrees with it." *Id*.

**2. Analysis**

Evidence militating in favor of appellant showed that: (1) no physical evidence connected him to Chavez's murder; (2) Mares pleaded guilty to Chavez's murder and received a sixty-year prison sentence; (3) Mares had prior felony convictions for two other murders and an attempted capital murder; (4) Davila pleaded guilty to Chavez's murder and received a five-year prison sentence; (5) Davila had prior felony convictions for robbery, drug possession, and drug trafficking, and he had his community supervision revoked; (6) Arriola had a prior felony-theft conviction; (7) in August 2005, when Mares provided his written statement to Ranger Escalon, he said in his statement that Bernardo Cortez and appellant were at the crime scene as "witnesses"; he did not say in his statement that appellant was present at Salazar's house the evening of Chavez's murder or that appellant kicked her and stomped on her or held her down; (8) on November 16, 2005, Davila gave a statement to Ranger Escalon in which he stated that when he arrived at the crime scene, he got into the passenger side of Solis's car, and he did not mention that either he or appellant helped to dig the makeshift grave or that he saw appellant dragging Chavez's body; (9) as part of his plea of guilty to Chavez's murder, Davila agreed to testify against appellant and the other co-defendants; (10) after his arrest for Chavez's murder, Davila told the media he was in federal custody when she died; (11) Dionicio Cortez testified that he did not know whether appellant was a Mexican Mafia member in November 2003; and (12) in April or May of 2006, Mares took "full responsibility" for Chavez's murder.

However, in this case, the contrary evidence does not greatly outweigh the evidence that appellant was a member of the Mexican Mafia at the time of Chavez's murder and that

13

he either committed or participated in her murder. Even though much of the incriminating testimony against appellant came from witnesses who had prior felony convictions, and even though two of them–Mares and Davila–did not tell Ranger Escalon about appellant's role in Chavez's murder, the jury was free to believe or disbelieve any portion of the witnesses' testimony, and we presume the jury resolved conflicts in favor of the prevailing party. *Wooten v. State*, 267 S.W.3d 289, 296 (Tex. App.–Houston [14th Dist.] 2008, pet. ref'd). Viewing all the evidence neutrally, we conclude that the evidence supporting the conviction is not so weak that the fact-finder's determination is clearly wrong and manifestly unjust, or that the verdict is against the great weight and preponderance of the evidence. *See Watson*, 204 S.W.3d at 417. We hold that the evidence is factually sufficient to support the conviction. Issue two is overruled.

### III. CONCLUSION

We affirm the trial court's judgment.


ROSE VELA
Justice


Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
13th day of May, 2010.

14